## BEACH v. AMERICAN BOX-MACHINE CO. et al.

(Circuit Court, N. D. New York. October 15, 1894.)

No. 6,170.

1. PATENTS—ANTICIPATION—TESTS OF INVENTION—MECHANICAL SKILL.
   Whether it required more than mechanical skill to change an alleged anticipating machine into the machine of the patent is to be determined by the inquiry whether a mere mechanic would derive from the prior machine the suggestion which would lead him to make the change.

2. SAME—INVENTION—COMBINATION—NEW RESULTS.
   Apparently slight changes producing a new combination and a new and beneficial result raise presumption of invention.

3. SAME—VALIDITY OF REISSUE—MISTAKE IN DRAWINGS.
   Reissue is warranted by mistake in drawings which renders the machine inoperative in part only.

4. SAME—AMPLIFICATION OF DESCRIPTION AND CLAIMS.
   A claim may be made more full and complete, by amendment, without new oath, if no new invention is claimed, and the old claim is not materially broadened.

5. SAME—INFRINGEMENT—PAPER BOX MACHINE.
   Where the two machines perform the same work in substantially the same way, infringement is not avoided by the fact that one part of defendant's machine does a little more, and the other a little less, than corresponding parts in complainant's machine.

6. SAME—PARTICULAR PATENT.
   The Beach reissue, No. 11,167, for a machine for attaching stays to the corners of paper or strawboard boxes, sustained and declared infringed.

This was a suit in equity by Fred H. Beach against the American Box-Machine Company and Horace Inman and others for the infringement of a patent. On final hearing.

Benjamin F. Lee and John Dane, Jr., for complainant.
Edmund Wetmore and William A. Redding, for defendants.

COXE, District Judge. This action is founded upon reissued letters patent No. 11,167, granted to the complainant May 26, 1891, for a machine for attaching stays to the corners of paper or strawboard boxes. The application for the original was filed June 10, 1885. The original, No. 447,225, was dated February 24, 1891. The application for the reissue was filed April 9, 1891. Prior to the invention it had been customary, says the patentee, to apply the fastening strips over the joints at the corners of the boxes, and paste them there, by hand. This work is now done by the patented machine. The claims involved are as follows:

"(1) The combination, with opposing clamping dies having diverging working faces, of a feeding mechanism constructed to deliver stay strips between

said clamping dies, and a pasting mechanism for rendering adhesive the stay strips, said clamping dies being constructed to co-operate in pressing upon interposed box corners the adhesive stay strips, substantially as described.

"(2) The combination, with opposing clamping dies having diverging working faces, said clamping dies being arranged to co-operate in pressing adhesive fastening strips upon interposed box corners, a feeding mechanism constructed to feed forward a continuous fastening strip, and a cutter for severing the said continuous strip into stay strips of suitable lengths, substantially as described.

"(3) The combination, with opposing clamping dies having diverging working faces, said clamping dies being arranged to co-operate in pressing an adhesive fastening strip upon the corner of an interposed box, a feeding mechanism constructed to feed between the dies a continuous fastening strip, a pasting mechanism for applying adhesive substance to the strip, and a cutter for severing the strip into stay strips of suitable lengths, substantially as described.

"(4) The combination, with opposing clamping dies having diverging working faces, said clamping dies being constructed to co-operate in pressing an adhesive fastening strip upon an interposed box corner, of a movable plunger or strip bender constructed to bend downwardly or inwardly a projecting end of the stay strip, that one of the clamping dies which engages the inner surface of the box corner being movable into and out of its usual working position, whereby it may engage and carry inside of the box corner the said projecting end of the stay strip, substantially as described.

"(5) The combination, with opposing clamping dies having diverging working faces, said clamping dies being constructed to co-operate in pressing an adhesive fastening strip upon an interposed box corner, of a movable plunger or strip bender constructed to bend downwardly or inwardly a projecting end of the stay strip, that one of said clamping dies which engages the inner surface of the box corner having a reciprocatory motion in a direction parallel with the box corner, so as to carry inward and press against the inside of the box corner the said projecting end of the stay strip, substantially as described."

"(7) The combination, with opposing clamping dies having diverging working faces, said clamping dies being arranged to co-operate in pressing an adhesive fastening strip upon an interposed box corner, of a feeding mechanism constructed to feed forward a continuous fastening strip, a cutter for severing the strip into suitable lengths, and a movable part or plunger which bends downwardly or inwardly the projecting end of the fastening strip, that one of the clamping dies which engages the inside of the box corner being constructed to reciprocate in a direction parallel with the box corner, substantially as described."

It will be observed that the first, second and third claims cover combinations designed only to fasten a stay strip over the joints on the outside corner of the box, while the fourth, fifth and seventh claims cover the additional feature whereby the stay strip is folded over the edge of the box and pasted on the inside as well as on the outside of the corner. The elements of the combination of the first claim are: First. Opposing clamping dies having diverging working faces and constructed to co-operate in pressing adhesive stay strips upon an interposed box corner. Second. A feeding mechanism to deliver the stay strips between said clamping dies. Third. A pasting mechanism for rendering adhesive the stay strips. The second claim omits the pasting mechanism of the first claim, repeats, substantially, the remaining elements of the first claim and adds thereto a cutter for severing the continuous strip into stay strips of suitable length to be applied to the box corner to be stayed. The third claim is, in substance,

a combination of all the elements of the two preceding claims. The elements of the combination of the fourth claim are: First. The opposing clamping dies of the preceding claims. Second. A movable plunger or strip bender to bend downwardly or inwardly the projecting end of the stay strip. Third. The anvil die, movable out of and into its usual working position so that it may engage and carry inside of the box corner the projecting end of the stay strip. The fifth claim is substantially the same as the fourth, the only difference being that the anvil die is described as having "a reciprocatory motion in a direction parallel with the box corner." The seventh claim adds to the combination of the fourth and fifth claims the feeding mechanism of the first three claims and the cutter of the second and third claims.

The defenses are, lack of novelty and invention; noninfringement of the fourth, fifth and seventh claims; unlawful expansion of claims in the patent office by amendment; invalidity of the reissue as such, it being the same, in all important respects, as the original; and failure to prove infringement, except as to the defendant Horace Inman.

The application was nearly six years in the patent office. Although placed in interference with five different claimants who contested the complainant's right with unusual pertinacity, he was successful over them all, at every stage of the controversy. Not content with the adverse decision of the patent office officials two of the contestants, one of them a defendant here, sought to have the complainant's patent canceled and awarded to them through the instrumentality of a court of equity. They were again defeated. What the machine of the patent does is this: an ordinary pasteboard blank is inserted between the clamping dies and it emerges a completed box, its corners being stayed by strips which have been firmly pasted to the box on the outside, the projecting end being then neatly folded over and attached to the inside also. The corners of the box are adjusted in the dies by the operator— all else is automatic. The box thus made is properly shaped, its corners are reinforced and made strong, and much heavier material is used, owing to the greater force which is applied, than is possible in a hand-stayed box. The machine is much more rapid than the hand process; it increases the production from four to ten fold. It does cheaper, cleaner, stronger, straighter and smoother work than that done by hand. Less material is used, the boxes are more uniform, artistic and symmetrical and are delivered from the machine ready for immediate use. The Beach machine, or one embodying the principle of his invention with some minor improvements added, at once became popular and ousted the hand process and the wire stapling method in many of the larger establishments. It has taken the market, become almost indispensable to the trade and, according to the weight of testimony, has made successful competition well-nigh impossible. This evidence is objected to because it is said that the machine to which the witnesses chiefly referred was the Knowlton and Beach machine,

which contains several patented improvements made by Knowlton. I am convinced that though this machine is an improvement upon the original, it contains the basic idea of the Beach structure, and it is this, and not the subsequent changes, which makes it popular. It would be illogical, in such cases, to attribute success to the nonessential, and not to the essential, features. Cochrane v. Deener, 94 U. S. 780, 787; Mergenthaler Linotype Co. v. Press Pub. Co., 57 Fed. 502, 505, 506.

But without the proof of the popularity of the machine there is ample evidence in the record to sustain the invention. The inventor does not pretend to be the first who attached stays of paper or muslin to the corners of paper boxes. The patent expressly admits that this had previously been done by hand. He does insist that he was the first to do this by machinery and asks only for a construction broad enough to prevent others from using his machine, or its equivalent. He asks nothing more. This statement of the complainant's position disposes of a large number of the exhibits offered by the defendants. These would be of value if a construction were sought covering the entire art of box-making, but such is not the case. The defendants have introduced 47 patents showing improvements in machines for making boxes, for inserting wire staples, for flanging boiler plates, for sticking labels and revenue stamps, for bending stiffeners for the heels of shoes and for applying shoe-button fasteners. It is conceded by the defendant's expert that none of these anticipates, and, as the counsel for the complainant admitted at the argument that the elements of the combinations, considered separately, were all old, the discussion is narrowed down to the consideration of two or three prior patents only. As I understand the defendants' position the infringement of the first three claims is not denied. The defense as to these claims is that they are void for lack of patentability. In approaching this subject it should be remembered at the outset that no one before Beach had attached adhesive staying strips to box corners by machinery. No machines in the box-making art, or any other art, would do this work. Beach was the first to accomplish this result. His was not a broad invention. His operations were confined to the improvement of a single step in the art of making paper boxes. He succeeded, and, in that limited sense, is a pioneer. The question is, whether in view of what is shown, it required more than mechanical skill to produce the machine of the first three claims. The patent No. 303,992, granted to Dennis and York, August 19, 1884, for improvements in addressing machines, is unquestionably the defendants' best reference. The improvements relate to machines "in which a strip of paper with the addresses printed thereon is run through the machine, the addresses being cut off in slips and automatically affixed to the newspapers, envelopes, or other articles by a descending knife and platen." The machine has a feeding and pasting mechanism, a vertically reciprocating gate, provided at its lower end with a knife to cut off the addresses, and a platen by which they are carried down and fastened

to the newspapers or envelopes. The bed on which the papers rest, and which is the only part of the machine which bears the slightest resemblance to the lower die of the Beach patent is called "a follower." Instead of being rigid this "follower," as the name implies, is supported upon light coiled springs and by lever action, so that it will move up and down freely and produce "just enough pressure under all circumstances to receive the pasted slip upon the upper sheet." The impact of the platen and plunger resembles the pat given to a freshly applied postage stamp. Being designed to do this light work the machine is lightly constructed and differs in many minor particulars from the Beach machine.

The defendants insist that a mere mechanic could construct the Beach machine from the Dennis and York machine, and, to illustrate this contention, they have produced a model of the Dennis and York structure so altered that, experimentally, it will, in a crude and awkward way, attach stay strips to boxes. The principal alteration is the removal of the platen and follower and the substitution therefor of the clamping dies of the Beach patent, the lower die being firmly fixed, or comparatively so. It is argued that a mechanic could do this. Possibly he might after having seen the Beach machine. But is this a fair criterion? There is hardly a patent that could stand such a test. The question is not whether a mechanic, having seen a box-staying machine, could alter the Dennis and York device into such a machine; not whether a mechanic, if he were told that such a box-staying machine was needed, could construct such a machine, although he had never seen one, from the Dennis and York device. The question is whether a mechanic, before any one had thought of pasting stay strips to the corners of boxes by machinery, would construct the Beach machine after seeing the labeling machine. Would the latter suggest the idea and the embodiment of the idea? Would the thought enter the mind of the skilled mechanic with the Dennis and York device before him on his work bench; and if it did, would it not be a creative thought whose presence would convert the mechanic into an inventor? The language of Mr. Justice Brown in Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, is applicable to the present situation. At page 161, 145 U. S., and page 825, 12 Sup. Ct., he says:

"While it is possible that the Stringfellow and Surles patent might, by a slight modification, be made to perform the function of equalizing the springs which it was the object of the Augur patent to secure, that was evidently not in the mind of the patentees, and the patent is inoperative for that purpose. Their device evidently approached very near the idea of an equalizer, but this idea did not apparently dawn upon them, nor was there anything in their patent which would have suggested it to a mechanic of ordinary intelligence unless he were examining it for that purpose. It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions."

The ability to conceive and carry out such changes as were here necessary is not found in the mere routine plodder no matter how skillfully he may handle his tools. Mechanics by the hundred had

seen the Dennis and York and kindred structures; workmen by the hundred had for years been sticking stay strips to box corners with their hands, and yet no one of them all had hit upon the Beach device. The advantages of a change from hand labor to machinery are obvious, and yet the idea, which is now said to be self-evident, never entered the mind of a single one of this large army of mechanics. Suppose Beach's machine had never been built, the art, unless some of those who claimed to be prior inventors in the patent office had supplied the want, would be in the primitive state that it was before 1885. No other machine could take its place. The fingers of women and children would still be doing the work of the "opposing clamping dies." Has not the art been materially advanced by the contribution of Beach?' The proposition cannot be maintained that the ingenious mechanism which has revolutionized this branch of the trade is only the product of mechanical skill. In the defendants' brief the proposition is bluntly stated as follows: "Surely it cannot be contended that the substitution of angular dies for the flat dies of the Dennis and York machine amounts to invention." Of course this is not the question presented by the record, but if it were, the court is by no means certain that the change suggested, considering all that it has accomplished, would not involve invention, even if this were all. Infinitely less were the changes required in substituting a wire barb for one cut from an iron plate; in placing a rubber back upon the packing for stuffing boxes; in substituting a torsional spring for coiled or flat springs in a telegraph key; and in substituting hard rubber, in lieu of materials previously used, for a plate for holding artificial teeth. And, yet, the supreme court has decided that to do these things required invention. Barbed-Wire Case, 143 U. S. 275, 12 Sup. Ct. 443, 450; Magowan v. Packing Co., 141 U. S. 332, 12 Sup. Ct. 71; Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670; Smith v. Vulcanite Co., 93 U. S. 486. A very slight alteration in an existing structure will often yield the most astonishing results. If the product of the change is a new combination and a beneficial result never attained before, it is safe to assume that its author is an inventor. The five applicants, including the active defendant, Horace Inman, who disputed in the patent office so vigorously with the complainant for the honor of being the inventor of the patented machine, evidently, at that time, thought something more than mechanical skill was involved. Indeed, the court might almost adopt as its own the language of the defendants in describing the genius and ability necessary to advance the art to its present condition. A catalogue issued by one of the defendants—the American Box-Machine Company—contains the following:

"The Inman Manufacturing Co., of Amsterdam, N. Y., recommends to the paper-box manufacturers of this country their new No. 6 corner stay machine, for staying the corners of boxes and turning the stay in at the same time. The demand for just such a machine is now met. First the wire stitcher came in and answered the purpose because nothing better could be had. Afterwards we got out the cloth-stay machine, which put the stay on the flat surface of the corner. This was a great improvement, but did not meet the full wants and demands of the box-making public.

They wanted a machine that would put the stay on the corner, and turn it under the same as the old hand method. This was a very difficult thing to do, but we have fully accomplished all—and more than we anticipated."

It is not necessary to examine the other patents introduced by the defendants. If the Dennis and York patent does not invalidate the Beach patent none of the others does. The Orr and Wright patents, Nos. 58,466 and 67,669, and the Munroe patents, Nos. 244,919 and 298,879, relate to the covering of boxes by winding paper around them. There is nothing in the machines described and shown to suggest the Beach machine. The other patents are still further remote.

The foregoing applies with even greater force to the combinations of the fourth, fifth and seventh claims. I am not quite convinced after reading the defendants' brief whether it is contended that these claims are void for lack of invention. The defendants' expert expressly concedes patentability as I understand his deposition. However, it is unnecessary to discuss the matter, as it is manifest that if the first three claims are valid these claims are also valid.

The patent was reissued three months after the original to correct a mistake in one of the drawings. The defendants contend that the law does not permit a reissue to correct inconsequential mistakes. The defense is wholly technical. No one but the patentee was in any way harmed by the reissue. The defense is without merits and does not appeal to a court of equity, which should hesitate long before destroying a valuable patent upon a mere abstraction. No authority is cited to sustain the defendants' theory and it is thought that no tribunal will ever take the harsh and narrow view contended for; certainly this court will not be the first to do so. It appears from the original patent, assuming it to be properly in evidence, that there was a clear mistake in the drawings. Though this mistake did not render the patent wholly inoperative it was of such a character that a machine constructed in accordance with the drawings would have been inoperative for some purposes which the inventor was entitled to cover by his claims. It is doubtful whether a mechanic following the drawings would have made the machine which the inventor intended to describe. By the terms of the statute (section 4916) it is not necessary that the patent should be wholly inoperative. If inoperative in part it is sufficient. Hartshorn v. Roller Co., 18 Fed. 90. This question was submitted to the commissioner and his decision is entitled to weight and will not be reviewed unless error is manifest from the record. Machine Co. v. Frame, 24 Fed. 596; Topliff v. Topliff, 145 U. S. 156, 171, 12 Sup. Ct. 825. There is nothing in the record to overcome the presumption of validity arising from the patent itself.

As I understand the defendants' position regarding the unlawful expansion of the claims it is that the amendment, dated November 7, 1890, was unauthorized and unlawful for the reason that the first three claims were broadened and no new oath was required. The new description and claims are undoubtedly more full and complete

than the original, but I cannot find that a new invention is claimed or that the old invention is materially broadened. The only paragraph which introduced new matter was corrected by order of the examiner. It should be remembered that for years the patentee was powerless to act by reason of the persistent manner in which his right to the invention was contested by others. When at last he had triumphed over all adversaries it is safe to assume that he was a wiser man. He had learned some things during the long controversy. That he was entitled to a patent which fully protected his invention there can be no doubt. If the invention as patented is different from the invention as described in 1885 the court has been unable to discover it. There can be no dispute that an inventor is entitled so to amend his specification that it will employ perspicuous and artistic language and enable him to hold all that he has invented. This specification does nothing more. In the language of the attorneys who filed the amendment, "care has been used to include nothing in the drawings or specification which was not contained in the same originally filed." Is there one of the claims that could not have been ingrafted on the original description? If so, which one? General accusations are made, but no feature is pointed out which is not found in the original specification. Grant that the description is not so clear, the fact cannot be disputed that every element of the combinations in dispute is found in the first description filed. There is no doubt about the rule of law laid down in Railway Co. v. Sayles, 97 U. S. 554, and the numerous authorities which follow it. The difficulty here is with the facts. If it could be shown that the scope of the original had been enlarged so as to enable Beach to appropriate other inventions the rule would apply. But this has not been shown. A new oath was not necessary because the amendments introduced no new invention. Nothing in the rules of practice of the patent office or the law required it. The grant of the patent is prima facie evidence that the necessary conditions precedent were complied with. Crompton v. Belknap Mills, 3 Fish. Pat. Cas. 536, Fed. Cas. No. 3,406; Whittemore v. Cutter, 1 Gall. 429, Fed. Cas. No. 17,600; Hartshorn v. Roller Co., 18 Fed. 90, and cases cited; Walk. Pat. § 122.

Infringement of the first three claims is, practically, conceded. The complainant's expert says regarding these claims that the defendants' machine is a copy of the Beach machine. I do not find this statement anywhere contradicted, except, perhaps, in a qualified way in the testimony taken September 11, 1894, and from the examination which I have given the two machines it certainly seems to be borne out by the facts. The combinations of these claims have, unquestionably, been appropriated. The rule applicable to the infringement of the other claims is clearly stated by Mr. Justice Blatchford. He says:

"Where an invention is one of a primary character, and the mechanical functions performed by the machine are, as a whole, entirely new, all subsequent machines which employ substantially the same means to accomplish the same result are infringements, although the subsequent machine

may contain improvements in the separate mechanisms which go to make up the machine." Sewing-Mach. Co. v. Lancaster, 129 U. S. 263, 273, 9 Sup. Ct. 299, and cases cited.

In Proctor v. Bennis, 36 Ch. Div. 740, Lord Justice Bowen said:

"The mere fact that there is an addition, or the mere fact that there is an omission, does not enable you to take the substance of the plaintiff's patent. The question is not whether the addition is material, or whether the omission is material, but whether what has been taken is the substance and essence of the invention."

There is no doubt that the defendants' machine operates to paste the stay on the outside of the box, turn it downwardly and inwardly and paste it on the inside of the corner also. In other words, it does the precise work that the Beach machine does and it does it by parts so nearly identical that even the experts find it difficult to state, not the differences of form, for these undoubtedly exist, but the differences in function and principle. The chief points of dissimilarity are—first, the alleged absence of the strip bender, and, second, the absence from the lower clamping die of the feature of "being movable into and out of its usual working position." There is a part in the infringing machine which corresponds exactly to the strip bender and is capable of performing the identical work. The defendants maintain that when the machine is properly adjusted the strip bender only operates to press the strip down upon the outer surface of the box corner and that it does not descend below the plane of that surface. The complainant insists, on the contrary, that, though the machine may be so adjusted, this is not the proper adjustment, not the one which the defendants intended, not the one which a sensible mechanic would adopt. That when the machine is properly adjusted its action in this respect is identical with the Beach machine. In confirmation of the latter contention it may be said that if this part performs no function additional to the pressing action of the upper die it is not easy to understand why it was placed in the machine at all. But even if the defendants are right upon this point there can be no doubt that the part in question forces, or bends, the projecting end of the stay strip downwardly. It can bend it in no other direction. True, it does not bend it down as far as the Beach strip bender, but it does bend it far enough, so that it is caught by the reciprocating lower die, or tucking finger, and carried inside of the box corner. The defendants' strip bender may do less work and their tucking finger more work than the complainant's, but it is perfectly plain that the two parts together perform the identical work that the corresponding parts perform in the Beach machine. Their action may not be synchronal, there may be structural differences, the defendants may have introduced improvements, and yet the fact stands out clear and indisputable, that the defendants' machine does the same work as the complainant's machine, if not by the same, certainly by equivalent means. Assuming that the complainant needs to invoke the doctrine of equivalents, surely it is not carrying that doctrine too far to hold the defendants' device an infringement when it is remembered that no one pretends that the

machine of the fourth, fifth and seventh claims ever existed before. "The range of equivalents depends upon the extent and nature of the invention." Miller v. Manufacturing Co., 151 U. S. 186–207, 14 Sup. Ct. 310.

As to the other point it is true that the lower clamping die, as a whole, does not, in the defendants' structure, move out of and into its usual working position. The lower die is divided, about half thereof remains stationary and the other half moves into and out of its usual position, or reciprocates in a direction parallel with the box corner, accomplishing the same result as the lower die in the Beach machine. The operation of the two is somewhat different. The Beach tucker moves on right lines while the defendants' tucker swings, for a time, in the arc of a circle, but when it does its work it moves in the same way, substantially, as the Beach tucker. The differences are immaterial. The defendants' mechanism performs the same labor and accomplishes the same result in substantially the same way as the complainant's mechanism. The former is the equivalent of the latter. Patents would be of little value if they can be avoided by such changes. Machine Co. v. Murphy, 97 U. S. 120, 125; Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970; Winans v. Denmead, 15 How. 330; Sargent v. Larned, 2 Curt. 340, Fed. Cas. No. 12,364. The law does not intend that one who has taken the invention in its entirety, who has appropriated the inventor's idea and the broad principle on which the structure operates which embodies that idea, shall escape infringement because he practices the invention in a slightly different form from that shown in the patent. The law, in such cases, deals with substance and not with form; it tears the disguise from the infringer and exhibits him in his true light. To adopt the language of Mr. Justice Grier in Blanchard v. Reeves, 1 Fish. Pat. Cas. 103, Fed. Cas. No. 1,515:

"It is true that the complainant's specification describes a machine, which effects its result by a combination of lateral and rotary motion, to form a helical course or track in the operation of the machine. But is that of the essence or substance of the invention? or is it not merely an accident of that particular form of the machine described? * * * We cannot shut our eyes to the fact that the defendants have pirated the invention of the complainant in all its essential parts."

As there is no proof of infringement by the American Box-Machine Company the bill must be dismissed as to it. The other defendants are sued as copartners, trading under the name of the Inman Manufacturing Company, and as this copartnership is admitted in the answer and as a sale by one of the partners is established, it would seem that the proof as to them and the copartnership is sufficient. It follows that the complainant is entitled to the usual decree as to all the defendants, except the American Box-Machine Company. The question of costs can be determined upon the settlement of the decree.