LAAS et al. v. SCOTT et al.

(Circuit Court, E. D. Wisconsin. April 2, 1908.)

1. PATENTS—SUIT IN EQUITY TO OBTAIN PATENT—PRESUMPTION FROM REFUSAL.
   In a suit under Rev. St. § 4915 (U. S. Comp. St. 1901, p. 3392), to obtain the issuance of a patent denied by the Patent Office and the Court of Appeals of the District of Columbia after a hearing in interference between the same parties, the decisions of such tribunals adjudging priority of invention to the defendant, are presumptively correct only, and that presumption is destroyed by proof that they were based on false and perjured evidence.

2. SAME—PERSONS ENTITLED TO PATENT—PRIORITY OF INVENTION.
   Under our patent system, he who first arrives at a complete conception of an invention is entitled to a patent therefor, unless the interest of the public is compromised by his lack of diligence in demonstrating that his invention is capable of useful operation. As between two inventors of the same thing, the one who first reduces the discovery to practical operation is deemed prima facie the true inventor without regard to the date of his conception, but the earlier inventor may overcome such presumption by satisfactory evidence that he used due diligence to perfect and utilize the invention, and actual reduction to practice is preferable to that which is constructive merely.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 113–123.

   Priority and continuance of public use of invention as affecting patentability. See note to Eastman v. Mayor, etc., of City of New York, 69 C. C. A. 646.]

**3. SAME—REDUCTION TO PRACTICE.**

When the inventor who is first to conceive is also the first to reduce to practice within the statutory period, he is entitled to priority, although a junior inventor may anticipate him by an earlier application for a patent, and may have secured such patent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 113–123.]

**4. SAME.**

In reducing an invention to practice, it is not necessary to prolong the test until its commercial value has been established, but, if it accomplishes the end desired, it is a perfected invention, although it may prove of little or no commercial value.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 113–123.]

**5. SAME—PERSON ENTITLED TO PATENT—RAIL ANCHOR.**

Priority of invention of the device covered by the Laas and Sponenberg patent, No. 757,754, for a rail anchor or anti-creeper, designed to prevent the longitudinal movement of the rails of a railroad track, adjudged in favor of defendant John M. Scott, on evidence showing that he was not only the first to conceive the invention, but also the first to reduce it to practice.

In Equity. On final hearing.
See 145 Fed. 195.

This is a bill in equity in the usual form for the infringement of letters patent 757,754, issued to complainants April 19, 1904. Prayer for an injunction and accounting. The device covered by this patent is known as a rail anchor or anti-creeper, designed to prevent the creeping or longitudinal movement of the rails of a railroad track. To this bill an answer was interposed denying infringement, setting up the claim that defendant John M. Scott was the original and true inventor and entitled to a patent therefor. Defendants also filed a cross-bill, under section 4915, Rev. St. (U. S. Comp. St. 1901, p. 3392), alleging priority of invention, and averring that on the 10th day of March, 1904, Scott filed an application for a patent in the Patent Office, and duly complied with all the requirements of the law and rules of the Patent Office; that such application was adjudged to interfere with letters patent 757,754 theretofore granted to complainants; that after declaration of interference evidence was taken by the respective parties, and the case was heard successively by the several tribunals of the Patent Office, and finally by the Circuit Court of Appeals of the District of Columbia. The issues in the interference are then set out, together with the opinions of such several tribunals. The prayer is that Scott be adjudged entitled to letters patent to the full extent of the claim of his application, as far as the issues of interference are concerned; and a decree is asked authorizing the Commissioner of Patents to issue such letters patent to the defendant Scott, upon compliance by him with the requirements of law and the rules of the Patent Office. The cross-bill also asks for a perpetual injunction restraining complainants from asserting any claim of title or monopoly against Scott or those claiming under him, based upon any claims awarded as the result of such interference. There is also a prayer for general relief and discovery. Issue was joined on the cross-bill by answer and replication. Much additional testimony has been taken in this court, which materially changes the case presented by the record in the Patent Office. Witnesses who gave material evidence in the interference case bearing on the date of complainants' conception have admitted on the witness stand that their former evidence was willfully and corruptly false, and that the shop book chiefly relied upon to fix dates was fraudulently manipulated and falsified by them; so that on this final hearing we are dealing with a case that differs essentially from that passed upon by the several tribunals of the Patent Office.

Otto R. Barnett, for complainants.

Walter S. Holden, E. H. Bottum, and C. C. Lithicum, for defendants.

QUARLES, District Judge. The attention of the court has been called to an agreement entered into by the several parties pendente lite, calculated to bring about a modus vivendi for the purpose of facilitating sales of rail stays under the several patents: At first blush, it seemed doubtful whether jurisdiction of the court would survive this adjustment; but a careful inspection of the stipulation convinces me that the issues under the cross-bill have not been compromised, but such controversy remains unaffected, except that all parties agree that the decision of this court shall be accepted as final, and no appeal therefrom shall be taken. The present controversy involves the question, which of two rival inventors was the first and true inventor of the device embodied in letters patent 757,754?

At the outset we are met by the contention of complainants that under the doctrine of Morgan v. Daniels, 153 U. S. 125, 14 Sup. Ct. 772, 38 L. Ed. 657, the final decision rendered in the Patent Office can be overcome only by evidence so clear and convincing as to exclude every reasonable doubt. I am persuaded that the Supreme Court never intended to emasculate the statute or to trammel the court of equity in its administration, but sought to emphasize the fact that in every doubtful case the decision of the Patent Office was entitled to deference at the hands of the court. Every judicial opinion must be read with reference to the facts upon which it is predicated. In Morgan v. Daniels the court was passing upon the same record made in the Patent Office, and, finding it a doubtful case, the doubt was resolved in favor of the tribunal specially intrusted with the administration of the patent system. In the instant case the proofs present issues which were not before the tribunals of the Patent Office. In the interference case the main question was one of diligence on the part of Scott, who, as agreed on all hands, conceived the invention in 1902, and, as the examiner found, offered no sufficient proof of reduction to practice prior to the time when Laas and Sponenberg came into the field. In the present hearing Scott has introduced new and convincing evidence of the reduction to practice in September, 1903. If this contention be sustained, the question of diligence is eliminated. In the Patent Office the date of the junior conception was established as June 27, 1903, largely by the testimony of Bryan and Fischer, who swore to the entry made in the shop book of the foundry in the usual course of business, upon which entry practically all the oral testimony as to the date of conception was based. Upon the hearing in equity Bryan and Fischer repudiated their former testimony as false, and impeached the entry in the shop book as fictitious and spurious because fraudulently manipulated by them. According to the present testimony of Bryan and Fischer and by another genuine entry in the shop book, the date of conception by Laas and Sponenberg was October 27, 1903, and subsequent to Scott's alleged reduction to practice. Thus a mass of testimony has been offered here tending to show that fraud and perjury have intervened to impeach the very foundation upon which the rulings of the Patent Office were based. These circumstances take the

case out of the doctrine of Morgan v. Daniels. In two cases the Supreme Court had held that the jurisdiction conferred by section 4915 upon a court of equity is original, and not appellate, in its nature, and that the case is to be heard according to the methods and procedure of a court of equity. Butterworth v. Hoe, 112 U. S. 50, 61, 5 Sup. Ct. 25, 28 L. Ed. 656; Gandy v. Marble, 122 U. S. 432, 439, 7 Sup. Ct. 1290, 30 L. Ed. 1223. It was not intended to reverse these cases. The same rule has been asserted in a later case. In re Hien, 166 U. S. 432, 17 Sup. Ct. 624, 41 L. Ed. 1066.

The wholesome admonition of the court in Morgan v. Daniels is entitled to be kept in mind in every such case. The final determination of another department of the government is not lightly to be set aside by the courts. But when new issues arise in the equity case, or it satisfactorily appears that the Patent Office has been imposed upon by fraud or perjury, the rule contended for cannot apply. The inventor who was unsuccessful in the Patent Office is still entitled to his day in court where the trial is in the strictest sense a judicial hearing by original bill with all the powers of a court of equity at the service of the parties to the suit. Bernardin v. Northall (C. C.) 77 Fed. 849, 852; Appert v. Brownsville Co. (C. C.) 144 Fed. 115, 117; Dover v. Greenwood (C. C.) 154 Fed. 854. The Court of Appeals of this circuit in the same case ruled that the decision of the Patent Office is not res judicata nor conclusive, and that its influence is persuasive merely. Scott v. Laas, 150 Fed. 764, 766, 80 C. C. A. 500. It appears that Laas & Sponenberg (hereinafter referred to as L. & S.) filed their application for a patent December 16, 1903; that letters patent No. 757,754 were issued to them April 19, 1904. Scott filed his application March 10, 1904. The interference was declared June 28, 1904, between claims 8 and 9 of Scott's application and claims 1 and 2 of L. & S. patent 757,-754. A comparison of dates claimed in the respective preliminary statements may be set forth as follows:

|  | Scott. | Laas & Sponenberg. |
|---|---|---|
| Conception | April 5, 1902 | June 27, 1903. |
| Disclosure | April 5, 1902 | June 27, 1903. |
| Drawings | April 5, 1902, and August 15, 1903 | June 27, 1903. |
| Patterns | Between April 5, and May 12, 1902 | June 29, 1903. |
| Reduction to practice | May 12, 1902, and September 15, 1903 | July 1, 1903. |

While L. & S. in their preliminary statement claimed reduction to practice under date of July 1, 1903, it is undisputed that there was no actual reduction to practice by them, unless the embodiment of the inventive thought in a full-sized casting answered the purpose of a reduction. The examiner of interferences found that Scott was the first inventor, and that his conception dated back to April, 1902. This finding is affirmed by each of the appellate tribunals of the Patent Office, and is not controverted here. There is, therefore, no dispute that Scott, not only conceived the invention

in 1902, but that in May, 1902, he made drawings and a wood pattern, and had full-sized castings made therefrom in the Brown foundry, in Racine, Wis. These facts may therefore be treated as established.

Thus the controversy is brought within narrow limits. The question first in order and paramount in importance is whether Scott, who was first to conceive, was also the first to reduce to practice. As to the law applicable to this case, I have carefully examined the numerous authorities cited in the briefs of counsel. A careful examination of the peculiar facts in each case will show a consistent line with less conflict than appears on the surface. To review them in detail would unnecessarily prolong this opinion. From all the cases I deduce the following principles applicable to this controversy: Under our patent system, he who first arrives at a complete conception of the inventive thought is entitled to recognition and reward, unless and until the interest of the public is compromised by his lack of diligence in demonstrating that his invention is capable of useful operation. The public may justly demand of the inventor who seeks a legal monopoly that within a reasonable time the invention be brought to such a state of perfection as to be adapted to actual use. To that extent the public interest is paramount. Actual reduction to practice is preferable to that which is constructive merely, as more to the interest of the public and reasonable indulgence ought to be extended to one pursuing that course in good faith. Therefore the inventor who first reduces the discovery to practical operation is held to be prima facie the true inventor, without regard to the date of his conception. But the earlier inventor may overcome this presumption and prevail, if he can show by satisfactory evidence continuous diligence to perfect and utilize the invention. Thus with nicety and fairness has the law adjusted the respective rights of rival inventors consistently with the general welfare. When the inventor who is first to conceive is also the first to reduce to practice within the statutory period, he is clearly entitled to priority, although a junior inventor may anticipate him by earlier application at the Patent Office, and may have secured letters patent. Agawam Woolen Co. v. Jordan, 7 Wall. 583, 19 L. Ed. 177; Christie v. Seybold, 55 Fed. 69, 5 C. C. A. 33; Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; National Cash Register v. Lamson Co. (C. C.) 60 Fed. 603. We are dealing with a simple device. It was strenuously contended at the bar that, when embodied in a full-sized casting, it was obvious to the average man that the device was mechanically correct, and would accomplish the purpose for which it was designed, and that, on account of its simplicity, no formal test was necessary. While this doctrine has been often sustained by the courts, I do not think it can be properly applied in the present case. The doubt which calls for experiment is well expressed in the testimony of Mr. Laas, one of the complainants, who is a railroad man of large experience:

"I remember of telling them if we can make this thing stick to the rail we will have something good. If we cannot, it is not worth anything."

I agree with the examiner that some actual test was necessary to demonstrate the efficiency of the device. I am also fully in accord with the decision of the Patent Office that Scott's shop test in 1902 was not sufficient to meet the requirements of the law, for the reason that power was applied directly to the anchor, instead of longitudinally through the rail, as would be the case in actual practice. In September, 1903, Scott made another test by placing five pairs of his rail anchors upon the rails of a side track at Racine, which, in view of certain new testimony here elicited, is entitled to serious consideration. The insufficiency of the proof in the Patent Office on this subject is unaccountable. The examiner says of this test:

"The testimony, however, does not show that the bumper at the end of the side track was subjected to the shock of moving cars while the rail anchor was in position, or even that any cars were ever placed on the side track at that time. An award of priority cannot be based upon the conjecture that Scott's experiment was successful, and, if not successful, it was such a test as would sufficiently establish the operativeness of the device under service conditions. These are matters which should be established by evidence. As there is no such evidence in the record, it must be held that the operation testified to by Scott and Walker did not constitute a reduction to practice of the invention at issue."

The exceptional conditions attending this side track and this test were not disclosed in the interference proceedings. It was not an ordinary siding where cars are occasionally stored, and where they are moved at a slow rate of speed, imposing no particular strain upon the track. It was a piece of track accommodating 12 cars, which was in constant use. Owing to a downgrade, freight cars were shunted in frequently at such a high rate of speed that a powerful bumping post was required to arrest them. This bumping post was specially designed and calculated to withstand a great shock. A blueprint showing its construction is in evidence. The post was so constructed and braced that the shock of the impact was communicated to the rails longitudinally. The strain upon the rails was so severe that they broke at the joints and the rivets in the splice bar were sheared off. It further appears that just beyond this siding there was a sharp curve in the main track, which prevented the engineer from catching the signal of trainmen, so that strings of freight cars were often "kicked" in on to this siding at excessive speed, which fact aggravated the difficulty. It was by reason of these facts that Scott chose this place to test the tenacity with which his anchor would adhere to the rails that were exposed to the greatest shock. The testimony shows that these anchors remained in place through September and October and until the rails were finally taken up, and that they held firmly in every instance, although the rails were bent by the violent impulse. Scott and Walker made almost daily visits to the side track, and testify that the anchors stood the test to their satisfaction. They were not the only ones who watched the experiment. Mr. Crowley, who was then the roadmaster of the Chicago & Northwestern Railway, observed these anchors when they were fitted to the rails, and watched the experiment with great interest. He was a railroad man of 40 years' experience in track maintenance. His attention had been directed to the increasing difficulty

known as the creeping of rails, and he was studying the problem with a view to overcome such difficulty. Mr. Crowley entirely corroborates the testimony of Scott and Walker as to the physical conditions and manner of use of the side track in question, and also as to the destructive influence of the shock and strain imparted to the rails through the bumping post. According to his testimony, this longitudinal shock and strain were greater than would be experienced on the main track under any ordinary service conditions, and that the test to which Scott subjected his rail anchors on this side track was more severe, and therefore more satisfactory than could have been had elsewhere. He also corroborates Scott and Walker in their statement that, notwithstanding the great shock and strain to which said rails were subjected, the anchors did not permit the rails to slip through, but held with great tenacity, and demonstrated to him as a practical railroad man that they were an operative success. This opinion was rendered more persuasive by the fact that he ordered a large number of these anchors for actual use upon his main line. Mr. Crowley is a disinterested witness, whose testimony was not shaken under a vigorous cross-examination. Keeping in mind the fact that the only question to be settled by the test is whether the anchor would hold the rail and not allow it to slip through the jaws, I cannot see why the side-track test did not amount to a satisfactory reduction to practice.

Mr. Robinson, in his work on Patents (section 129), speaking of reduction to practice, says:

"Nor is it necessary that the invention as a means should be incapable of further improvement by the exercise of additional inventive skill. If it accomplishes the end desired, it is a perfected invention, although some newly generated idea, or some better mode of application may reach the same end in a more perfect manner."

This is only another way of saying that it is not necessary to prolong the test until the commercial value of the invention has been established. It may be a completed invention, although it may prove of little or no commercial value. When embodied in letters patent, it must compete in the market with other devices of its kind. I think Scott made a practical demonstration that the jaws of his anchor would hold the rail base so as to withstand the shock and strain to which it would be subjected in actual practice.

In passing upon the sufficiency of this test, I have been somewhat influenced by another consideration. Scott was not the first to devise anti-creepers. L. & S. had preceded him by some years, and had demonstrated by actual experience that their device, known as "No. 4 anti-creeper," would hold to the rail with such tenacity as to make it a workable device. They seem to have satisfied the railroad people on this score, for we find that in October, 1903, they were buying car load lots of the No. 4 anti-creeper for actual use on various lines. Scott's device was from a mechanical standpoint much better calculated to meet the supreme test. The L. & S. anti-creeper was constructed of one piece, the jaws grasping only one side of the rail base. Scott's device consisted of two jaws adhering on both sides of the rail, drawn together by a bolt and nut underneath the rail. The jaws were furnished with teeth that embedded themselves into the texture of the

rail base. There can be no dispute that mechanically and practically, as the event has proven, Scott's device presented superior advantages for securing firm adherence to the rails. When, therefore, in October, 1903, it had been demonstrated by actual practice that the L. & S. No. 4 anti-creeper had passed the experimental stage and had proven a commercial success, Scott was justified in resting upon the tests already made, supplemented as they were by the success of the earlier device.

In Juengst v. Boyer, 63 O. G. 152, the commissioner said:

"In the case of a mechanism, reduction to practice consists in the construction of a mechanism of a size capable of practical use, and a knowledge, preferably by actual trial, that it will work practically for the intended purpose."

In other words, knowledge may also be predicated upon the actual trials of others with a similar device.

In Shaffer v. Dolan, 107 O. G. 539, the commissioner says:

"Where it appeared that a gas burner forming the subject-matter of an interference had never been put to an actual test, but that a tip differing therefrom only in a slight variance in the inclination of the air inlets had operated successfully, held that the operation of the device in issue was evident from the operation of the prior device, and that no test of the burner in issue was necessary to constitute reduction to practice."

For these reasons I am constrained to hold that Scott, who was the first inventor, was also the first and only one to reduce the invention to practice, and that, therefore, without regard to the date of the junior conception, Scott is entitled to priority, notwithstanding the presumption arising from the letters patent granted to complainants.

Counsel will prepare the necessary decree in accordance with this opinion.