GENERAL ELECTRIC CO. et al. v. STEINBERGER.

(Circuit Court of Appeals, Second Circuit. April 7, 1914.)

No. 243.

PATENTS (§ 328*)—PERSON ENTITLED TO PATENT—DISK STRAIN INSULATOR.

The disk strain-insulator having rain-shedding annular corrugations, covered by the claims put in interference in the Patent Office between Hewlett and Steinberger, previous to which patent No. 904,370 was issued to Steinberger, *held* to have been independently invented by Hewlett, who, as the inventor first reducing the invention to practice by filing his application, is entitled to the patent therefor.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the District Court, Eastern District of New York. The suit was brought under

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

section 4915, Rev. Stat. U. S. (U. S. Comp. St. 1901, p. 3992), praying that a patent be issued to complainant for the device covered by claims 9, 10 and 11 of United States letters patent No. 904,370 for a disk strain-insulator, granted November 17, 1908, to defendant, Steinberger. The District Court decreed that Hewlett was the first inventor and entitled to a patent. The General Electric Company is the assignee of Hewlett. The opinions of the District Judge will be found in 208 Fed. 699. Affirmed.

C. H. Wilson, of New York City, for appellant.

Charles Neave, of New York City, for appellees.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. The facts are very fully set forth in Judge Chatfield's opinion, which may be referred to for any not here recited. A disk strain-insulator, as its name implies, is a disk of insulating material, mounted so that the line of its axis is substantially horizontal. To it from one side comes a current-carrying wire; a similar one leads from it on the other side. These two wires are insulated from each other by a mass of insulating material in the body of the disk; in service the current is carried around the insulator by a shunt wire. The current is powerful, the wires heavy, and the device must be strong; it is thickened about the axis. Generally a plurality of these insulators are coupled together in a series. The general appearance of the disk suggests a pulley with bosses at the axis and various projections from it, which will be referred to later on.

A good idea of the structures may be formed from inspection of Figures 4, 5, and 6 of Hewlett's application, here reproduced. Figures from the drawings of Steinberger's patent will appear later on.

Fig. 4    Fig. 5    Fig. 6.

The three claims of Steinberger read as follows:

"9. A disk strain-insulator, comprising suspension members, a mass of insulating material partially enveloping the same, said mass being provided cen-

trally with a disk integral therewith and lying substantially in the general equatorial plane of said mass, and further provided with flanges extending in opposite directions from said equatorial plane.

"10. A disk strain-insulator, comprising suspension members, a mass of insulating material partially enveloping the same and having a disk portion, said disk portion being provided with annular collars extending in opposite directions and in the general direction of said suspension members.

"11. A disk strain-insulator, comprising strain members, a body of insulating material partially enveloping the same and having a comparatively large disk, said disk being provided with collars integral therewith and extending in opposite directions."

There is a constant tendency of the current to leave the main wire where it runs into insulation and to creep around the outside and over the edge of the disk till it reaches the wire on the other side. It is the object of the invention to control this tendency. One way to do this is to lengthen the path along which the current undertakes to creep. This may be done by enlarging the diameter of the disk. It may also be accomplished by corrugating the surface of the disk, for the creeping current always moves on the surface of the disk, and if it has a succession of protuberances to march over its journey may be materially lengthened. When the disk is wet—these insulators, of course, are exposed on the line to atmospheric conditions—it is much easier for the current to creep along it. To meet that difficulty the device is arranged so that the protuberances from the disk will not only increase the length of the pathway, but will serve as hoods or covers to parts of the surface, so that whether rain falls perpendicularly, or is blown in against the disk from one side or the other, there will always be some part of the surface kept free from moisture; the protuberances act as baffle boards, and, with the disk form channels through which the water runs to the edge of the disk and falls off.

It seems not to be controverted that the application of Hewlett and the patent of Steinberger cover the same invention. Hewlett was first in the Patent Office, filing application on April 20, 1907. Steinberger's application was filed January 20, 1908. Since it illustrated and described the invention disclosed in Hewlett's application, an interference should have been declared. But the office overlooked Hewlett, and by inadvertence issued the Steinberger patent on November 17, 1908. Having subsequently discovered its error, the office declared interference between Hewlett and the three above-quoted claims of Steinberger's patent. Upon the hearing of the interference Steinberger took testimony to show that he conceived the invention and made sketches about March or April, 1904. He did not, however, reduce his invention to practice until he filed his application. We think this did not disclose such reasonable diligence as would entitle him to priority over Hewlett, whose application was filed nine months earlier. As we understand the record all the tribunals which have considered the question reached the same conclusion.

Steinberger further showed that in October, 1905, he wrote to an engineer named Buck disclosing an insulator and inclosing a sketch of the same. This he alleged embodied the invention in interference, and he contended that Buck had communicated it to Hewlett. Hewlett's

attorney, being of the opinion that Steinberger's letter and sketch did not embody the invention, took no testimony on behalf of Hewlett. The Examiner of Interferences held that the letter and sketch were not a disclosure of the invention and awarded priority to Hewlett. On appeal the Board of Examiners 'in Chief affirmed this decision. The next appeal was to the Commissioner of Patents, who held that there had been a disclosure to Buck, and that upon the record as it stood it was to be inferred that Buck had communicated such disclosure to Hewlett. The latter then appealed to the Court of Appeals for the District of Columbia, which affirmed the Commissioner of Patents. Thereupon this suit was begun, with the result above set forth.

This suit is in no sense an appeal from the Court of Appeals of the District of Columbia; there is testimony in this record which was not before that tribunal. Nevertheless its decision on a question of fact is entitled to great consideration. As the Supreme Court said in Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657, it will be accepted "unless the contrary is established by testimony which in character and amount carries thorough conviction." Before discussing the question whether or not there is such testimony in this case, a preliminary matter may be first disposed of.

In 1905 and 1906 Buck & Hewlett were working together to devise a *system* of suspension for high tension wires for which they filed a joint application on February 15, 1906. It covered not only the system, but also this insulator. Since each of the two had contributed something to the invention of this system, there seems to us nothing mysterious or suspicious about the filing of this joint application. Shortly thereafter, when the attorney's attention was called to the fact that the insulator might have a broader application than in that particular system, and that Hewlett believed himself to be the sole inventor of the disk insulator, and that Buck did not dispute this, the claims for insulator were canceled out of the joint application, and a sole application for them was filed by Hewlett. In this we find no reason sufficient for denying the relief prayed for. It is unnecessary to discuss Hewlett's narrative of the various steps in his invention, or the testimony as to his alleged knowledge of Steinberger's 1905 disclosure. Both Buck and Hewlett testify that the contents of the letter and sketch were never communicated to the latter. In our opinion it would make no difference if Steinberger had sent them to Hewlett, instead of to Buck. The only real question in the case is whether the sketch disclosed the subject-matter of the invention in interference.

The letter of Steinberger of October 7, 1905, is in answer to one of Buck in reference to the manufacture of a disk of the particular insulating material (electrose) which Steinberger was handling. It tells of making a disk of 14 inches diameter and incloses a sketch marked No. 2 of which it says:

"Please note that we have indicated the surface of the disk as being corrugated. Our object for corrugating the planes of the disk is to provide additional surface, without increasing the diameter of the disk, thereby providing for surface leakage (of electricity) and enabling you to impress a greater voltage than you could do on a disk with plane surfaces."

We here reproduce, side by side, the drawing of the disk in Steinberger's patent—hereinafter referred to as Type B—and the sketch of October, 1905, enlarged as in defendant's brief and hereinafter referred to as Type A.

Type A.　　　　　　　　　　Type B.
Steinberger Sketch.　　　　Steinberger Patent.

As was pointed out above, there are two methods for preventing the disastrous effects of creeping. The first is merely to lengthen the path to be crept over, the second is to make that lengthened path more difficult to travel by keeping parts of it substantially dry in all weather conditions. Inspection of the drawing of Type B shows that the projections which lengthen the path are so arranged as to secure this latter advantage. It is equally apparent that the projections—or "corrugations" as the latter calls them—of Type A will not do so; there are no channels formed by corrugation and disk surface to drain off the falling water, which will flow over the whole disk, whether it is two inches or two feet wide.

We do not understand that the Court of Appeals of the District of Columbia held as matter of fact that a disk 14 inches in diameter of Type A would have the hoods or covers which would prevent the surface from getting wet. If they did, we should not hesitate to reach

214 F.—50

a different conclusion; the structure being so simple and its functions under rainfall so manifest that no expert's testimony could clarify or obscure the situation. In its opinion the court says:

"We think that Steinberger at the time of this disclosure *had in mind* the idea of *so constructing* his device that it would divert moisture." ·

Also:

"The corrugations of Steinberger, *being properly positioned*, perform and were intended to perform substantially the same function as the so-called 'flanges' and 'collars' of the issue."

If the words last above italicized are intended to mean that as positioned in the sketch Type A they will perform that function, inspection of the sketch shows that the statement is incorrect. If, however, as is more probable, they were intended to mean that the corrugations shown in Type A, *when properly positioned,* might be made to perform that function, the statement is correct, but in our opinion unimportant. The question is, What did the sketch disclose? not what Steinberger had in mind he might do with it, nor what might be accomplished by effecting a radical change in the contour and position of the corrugations.

We think the error of the Court of Appeals consisted in giving too broad an interpretation to the claims in interference and then concluding that the exhibition of any type of device which would infringe them was a disclosure of any other type of device which would also infringe them. Turning back to the three claims, it is evident that their language is very broad, broad enough to cover, not only the "flanges" and "collars" shown in Type B, which undoubtedly afford protection against moisture, but also other collars and flanges, which like the corrugations of Type A will not afford any such protection. But, without any reference at all to the prior art, which undoubtedly is such as to require a narrower construction, the patent itself precludes so broad an interpretation. If anything is well settled in patent law, it is that claims must be read in the light of the specifications. Referring to the specifications of the Steinberger patent we find the following:

The patentee states that his invention relates to strain-insulators, particularly those of the disk type; the special object being to improve their structure and to render them as near as practicable "proof against the evil effects of moisture." Referring to the drawings he says that Fig. 1 shows "the various annular hoods used for enabling the insulator to shed moisture." Referring to Fig. 2 he calls attention to "steps *16* of annular conformity," "an annular flange *18* separated from the steps by an annular groove *17*. A larger flange *20*, also of annular form, disposed adjacent to the flange *18* and separated therefrom by an annular groove *19*—and a disk *21* extending directly outward." He then says:

"With an insulator made as above described and mounted so that its general axis of suspension is horizontal, the pairs of flanges and of grooves separating the same serve to prevent the effective entrance of moisture in such

manner as to destroy the dielectric qualities of the insulator. As may be seen from Fig. 2, it is impossible for rain to so thoroughly wet all parts of the insulator as to invite undue leakage of the electric current. If the rain flows into the insulator from the right-hand side, some part of the annular flanges will remain dry. Similarly, if the rain beats in from the left-hand side, according to Fig. 2, some parts of the flanges will likewise remain dry. Unless the rain assumes unusual violence, it is difficult, if not impossible, for the moisture due either to the spattering of raindrops, the lateral effect of the wind upon the rain, or the creeping of rainwater from any cause, to totally destroy, or even seriously impair, the insulating qualities of the device."

Other parts of the specifications refer to another feature of the structure, viz., the method of connecting the current wires with the insulating disk, strengthening it against strains. But these do not figure in claims 9, 10, and 11, the only ones in issue in the interference, which deal with the flanges or collars. Certainly in the light of the specifications these three claims cannot be construed to cover flanges, collars, corrugations, or protuberances of any kind, which are *not* adapted to perform the function, the performance of which Steinberger announced as *his* particular contribution to the art.

We are not concerned in this case with any exhaustive examination into the state of the art, in order to determine whether or not there was patentable invention in so modifying nonrain-shedding corrugations that they will perform a new function. For the purpose of this suit it must be assumed that rain-shedding flanges were patentable at the date of the application; both sides, of course, contend that the claims to that extent are valid. But if it were an inventive step to advance from Type A to Type B, surely there can be no force in the contention that a disclosure of Type A was a disclosure of Type B.

The decree is affirmed, with costs.