**CURTISS AEROPLANE & MOTOR CORPORATION et al. v. JANIN et al.**

(District Court, E. D. New York. April 30, 1920.)

**Patents ☞114—Priority of invention of hydro-aeroplane determined.**

The decision of the Court of Appeals of the District of Columbia in Janin v. Curtiss, 45 App. D. C. 362, on an interference issue awarding to Janin priority of invention of a hydro-aeroplane, *held* correct in a suit by Curtiss under Rev. St. § 4915 (Comp. St. § 9460), to obtain a patent therefor, and his right to a patent denied.

In Equity. Suit by the Curtiss Aeroplane & Motor Corporation and Glenn H. Curtiss against Albert S. Janin and the Janin Company, Incorporated. Decree for defendants.

S. Mortimer Ward, Jr., of New York City (Richard Eyre, of New York City, of counsel), for plaintiffs.

Thomas A. Hill, of New York City, for defendants.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CHATFIELD, District Judge.   The present action is brought under section 4915 of the Revised Statutes (Comp. St. § 9460) asking an adjudication that the plaintiff Glenn H. Curtiss is entitled according to law to receive the patent for certain improvements in aeroplane structures, having the capacity of alighting upon and flying from water, for which the Court of Appeals of the District of Columbia rejected the application of the plaintiff Curtiss, holding on June 1, 1916 (Janin v. Curtiss, 45 App. D. C. 362), that the defendant Albert S. Janin should be granted this patent based upon claims which in the form of a single issue were the subject-matter of an interference proceeding between the plaintiff Curtiss, herein and the defendant Janin, herein, in the Patent Office of the United States.   This is not a case between interfering patents, under section 4918, R. S. (Comp. St. § 9463).   The scope of a decision such as is sought in the present case is stated at more or less length in General Electric v. Steinberger (D. C.) 208 Fed. 699, affirmed 214 Fed. 781, 131 C. C. A. 193.

The first record in the Patent Office was an application filed by the defendant Janin on January 26, 1911.   This particular application was followed by a second, in which biplane wings were used in the place of the monoplane wings.   This second application was filed August 9, 1911, and was in the Patent Office under consideration when on July 31, 1913, after the instituting of the interference proceeding, Janin's attorney had prepared and filed a divisional application showing only such parts of the original drawings and specifications as related to the subject-matter of the interference issue.   The plaintiff Curtiss' patent application was filed on the 22d of August, 1911.

The first Janin application has been abandoned, as has, apparently, been the application filed August 9, 1911.   These applications described a vehicle or vessel capable of flight in the air with an automobile running gear, for use in either starting or lighting upon the land from the air, and in proceeding on the land as well, and with a body for the machine which would constitute a boat or floating and supporting craft, intended by the inventor to be driven forward when resting upon the water by the same air propellers used to propel the apparatus when flying in the air, and also by paddle blades attached to the spokes of the wheels.

The expressed intention is to reach a speed upon the water at which the air lift of the planes will separate the craft from the water and allow it to continue its course as an aeroplane, in the same way in which it would be operated if it had arisen from the ground.   The boat-shaped body of the craft was also planned to enable it to alight from flight upon the water as well as upon the land.   Mechanism was shown for folding the monoplane or biplane wings and rotating them about a universal joint to a position where they would present the edge of the folded surfaces toward the front when the machine was to proceed as an automobile on the land.

The defendant Janin has always claimed throughout the proceedings that he conceived the idea of a boat, with wings for operation in the manner described, in the year 1899, when he, as a boy of about 19 years, worked upon a steamer between New York and the West Indies

Islands. His ideas were copied from the flying fish, which, leaving the water, seemed to him to balance itself by the fluttering motion of its under wings or fins, until its larger wings were able to steady it in the air, and from the tips of the wings and the tail of the sea gull, which, as every one knows uses the flexible tips of its wings in controlling its motions in the air, changes the angle of those wings and of its tail in rising or falling and settling upon the water, and which leaves the water for the air by lifting itself with the supporting force of its wings, through muscular effort. The flying fish, on the other hand, according to Janin's testimony, shoots up or darts up out of the water, evidently exerting a part of its muscular force against the water, and getting into the air, before its wings furnish a complete support by the lifting thrust of the air resistance against the wings.

The defendant Janin was a man of straitened circumstances working as a carpenter after his return ashore, and with a family which increased rapidly. In 1912 he had 7 children, and has had 13 children in all, of whom 7 are now living. He lived in a small building on Clifton avenue, at Rosebank, Staten Island, until about the year 1912. For several years before moving from that house (because of sickness and lack of room) he made use of a small shed or shop back of the place where he lived and in the rear of the house of one Lamb on the next cross street. In this shop during that period he worked upon a full-sized model of his invention.

During the course of this trial many minor points have been put in issue as to the exact dates and circumstances of this work, but the witnesses are sufficiently corroborated, and corroborative of each other, to satisfy the court that Janin was working on this boat long prior to the date when he filed his application in the Patent Office on January 26, 1911. His work amounted to nothing practical, for his lack of funds and the necessity of leaving the machine when he moved led him to use the material as firewood, and nothing remains but a sheet iron pontoon, which has been marked as an exhibit in this case, and which in size and shape corresponds exactly with the original drawings and with the patent application of 1911, but differs a little from the application of 1913.

There has also been put in evidence one of two propellers made by the defendant and exhibited by him to several of the witnesses in the year 1909. Later he delivered one of these propellers to a witness Daniels, referred to as a prospective witness for the defendant, but called to the stand by the plaintiff, whose testimony is undoubtedly accurate, as evidenced by a letter produced, written by him to Janin, and put in evidence in the case. The workmanship and features of this propeller will be referred to subsequently.

This witness Daniels testified that Janin afterwards became involved in some altercation with him over an endeavor to have Daniels testify that Janin applied to him for the rental of an engine at the time of exhibiting to him the propellers. One of the propellers is still in Daniels' possession and some acrimonious dispute arose over Janin's efforts to have Daniels find and produce the propeller, which would involve a great deal of work on the part of Daniels.

But, ascribing to Janin all of the conversation which Daniels attributes to him, and assuming that Janin has endeavored to get Daniels to testify to things as to which Janin might have been mistaken, or should know did not occur, nevertheless Daniels' testimony establishes the date of 1908 or 1909 as the time when Janin was constructing his boat and making inquiries about engines for aeroplanes which were being built by Daniels on Staten Island, and as to which Janin must have had knowledge. These engines were two and six cylinder gas engines, and their existence corroborates the testimony of the Janin witnesses in fixing the dates in years earlier than the plaintiff now contends Janin could have understood and had in mind the matters disclosed by his application of January, 1911.

The plaintiff Curtiss had had mechanical experience in the repair and construction of bicycles and of motorcycles and engines therefor when he undertook experiments in the building of aeroplanes and their engines at his home in Hammondsport, on Lake Keuka, N. Y. He had successfully flown an aeroplane prior to 1908, and his means of controlling an aeroplane was involved in litigation with the Wright Bros., finally terminating in favor of the Wrights, by the case reported as Wright Co. v. Herring Curtiss Co., in 211 Fed. 654, 128 C. C. A. 158.

Curtiss obtained means to carry on his aeroplane experiments and for the building of his improved engines by exhibiting at county fairs and other places where crowds would be assembled. In 1908 Curtiss experimented with an idea of the witness McCurdy, using a catamaran formed with two canoes as a support for the wings and engine of an aeroplane (which he had named the "June Bug," and with which he had made successful flights from the land) by gliding over the waters of Lake Keuka, in an endeavor to see whether the aeroplane would leave the smooth surface of the lake under similar conditions to those under which it would rise from the land. Curtiss' association with the neighboring lake, and the evident ease of proceeding in canoes over its surface, made this attempt natural, and of itself indicated no great discovery or inventive idea. The same idea from time to time occurred to other people and was attempted in different ways, arousing great curiosity and interest in the press and public.

In evidence in this case are the Forlanini United States patents, No. 1,024,067, issued in 1912, on an application filed July 26, 1907, and No. 1,112,405, issued September 29, 1914, on an application filed April 9, 1905, showing wings or airplanes supported by several sets of hydroplanes or hydrofoils; each set consisting of several planes suspended below each other in the water on a vertical frame projecting down from the wing structure on each side of the center line or pontoon. Also the Dyer application for a land, water, and air craft with planing surfaces on each side, was filed April 26, 1905, but not allowed until September 1, 1914.

In May, 1910, Fabre flew an aeroplane from the water in France, and this was described in the United States in the Scientific American of December 17, 1910. He used three hydroplanes attached to a tricycle frame supporting his wings, engine, and operator's seat. Hydroplane

surfaces and the hydroplaning idea were old, but little used. Long, narrow craft, such as canoes and racing shells, propelled and also held on an even keel, or righted by the use of paddles or sweeps (not continually on the water), and rendered more stable as speed increased, on the principle of a bicycle, had long been in common use. An automatic application of this idea for restoring balance had not been needed, but was suggested by the De Lambert hydroplane of 1895, patent No. 538,527, and by Forlanini, who used rudders in his device, but suggests that on a straight course they may be lifted, and the accuracy of the course regulated by proper distribution of weights, or by varying the relative angle of the submerged blades on the opposite sides of his craft, and who also restores equilibrium by the differing bearing surface of the planes as they are forced up and down in the water.

The general idea of proceeding upon the water or flying from the water with a so-called hydro-aeroplane was not patentable as invention, or was never claimed as such by the many persons who sought to devise a successful and practical means for obtaining the result. Curtiss knew of the form of catamaran used in the South Seas, with an outrigger. He was familiar with bicycling, and his suggestion, as an improvement over the two-canoe catamaran, was to use one canoe with outriggers. This idea by itself would not be patentable, unless applied to an aeroplane in such a way as to show mechanical invention over the two-canoe catamaran in other respects than lessening the drag of the boat part of the craft. It was common knowledge at this time that a bicycle or racing wheel could be kept in equilibrium and attain greater speed than could be reached with a structure having stable or constant points of contact and balance with the earth or the water, as the case might be.

Curtiss evidently made the suggestion that a single canoe, with outriggers, would run more easily and give more speed than a double canoe, but shows no definite appreciation of the other principles which he subsequently used in constructing a device which would do what he and others had in mind. He did not attempt to put his suggestion into practice, or to work out the possibilities of that idea. The "June Bug," with the two canoes, never left the water or was brought to a speed where leaving the water could be attempted; in other words, a speed where the lift of the wings would be sufficient to fly in the air in case the water could be arisen from. At one time he tried the idea of a single canoe with outriggers. He placed the outriggers on the underside of his planes, using tin pontoons and later old automobile tire tubes, in order to get buoyancy with little weight, and fixing them in position by a so-called slat, which would drag in the water at an angle, like the toe of a small boy, steering his sled while sliding down hill, or like the paddle of a canoe, dragging in the water both to change direction and preserve balance. Curtiss testifies that he was more or less familiar with the use of canoes, and it is probable that this was the source of his idea.

Curtiss dropped the matter temporarily and began preparations for the winning of a prize offered for a continuous flight by aeroplane from Albany to New York, along the line of the Hudson river. For this

purpose Curtiss constructed an aeroplane with a canoe rigidly supported beneath the aeroplane, by means of which he hoped to succeed in floating in case he was compelled to alight while following the river. He did not intend to proceed upon the water, nor to rise from the water, and had the usual wheels for flying from the land. He was successful in winning the prize and did not descend upon the water at any time. He later exhibited this machine at Atlantic City, and in such ways spent his time until later in the year 1910, when he again, at Hammondsport, went in with his experiments with one canoe attached to his ordinary aeroplane wings and engine. He attempted to get this structure up to a speed where the planes would support it in the air and force it from the water. The canoe not only dragged heavily as the speed increased, but buried itself in the boiling water at the stern. Small boards or hydroplanes under the canoe had been tried in June, 1910, but were unsuccessful, and experiments with the canoe were abandoned. He showed no idea of using hydroplanes instead of the canoe, and in fact showed no appreciation of the principles of hydroplaning in any way.

Curtiss learned of the experiments then being conducted by Fabre in France, in which Fabre was using hydroplane surfaces as supports for his aeroplane. The prior art shows that the principles of hydroplaning had been known since 1872, when they were discussed by Froude [1] in England; but no application was made, through the lack of demand for such surfaces, until the development of power engines and higher grade steam engines. The ordinary steam engines of the prior art had not been able to drive boats at such speeds as to lead builders to the conclusion that increased speed resulted in a disproportionate increase of resistance, when the speed reached a point where the mutability and mobility of water was lost, and where it resembled a more or less solid or congealed surface.

But the development of engines brought out that a boat moving sufficiently fast could slide up and out of the water until a point was reached where it in effect rested on the water as on a jellylike, or even congealed, surface, and the utility of the hydroplane was recognized. The bottoms of boats were then shaped in hydroplane fashion to conserve and appropriate to the greatest possible extent the qualities of water in allowing a boat to slide up and rest on the water as well as to cleave through it:

Andrews patent, No. 7449 (1850), for a hyroplane surface boat.
De Lambert patent, No. 538,527, issued in 1895, for a boat with hydroplaning outrigger surfaces.
Holmstrom French patent, No. 395,111, of December 18, 1908.

With Fabre's ideas in mind Curtiss built a hydroplane float of the same shape as Fabre and of sufficient size to support the weight of his aeroplane, with its engine and driver. He took one of his land machines, in which the engine was placed some distance above the wheels and nearly in a line with the propellers. The probability that the ma-

[1] Reported by Rev. C. W. Rasmus, and printed July 21, 1874, by Syre & Spottiswood, Limited, East Harding street, London.

chine would tip forward or back in rotation around the point of support on the pontoon, and that this tendency to rotate would be increased when the engine was started, was so self-evident that, apparently as soon as these experiments were started, Curtiss placed a small pontoon at the front of his frame, where, for use upon the ground, he had a third wheel, by means of which the downward rotating thrust of his engine could be converted into a forward push in getting up speed on the earth. This thrust naturally had to be overcome on the water, and another hydroplane surface was the obvious way for him to prevent nosing over, and at the same time to provide for forward progress on the water. His machine for these experiments was sent to California. For several days in the month of January, 1911, he and his assistants experimented, using the vertical and horizontal rudders and the wings and the aeroplane as he would use them in tilting his machine up in leaving the ground. He employed in this the back draft of his propellers, in so far as they would overcome the forward thrust of the power applied in the line of his propeller shafts.

Various failures resulted in causing him to add a canvas extension to his main pontoon to increase its hydroplane surface, the addition of a canvas shield, to protect from spray and also to help the lift of the planes, and finally in the placing of a so-called hydroplaning board (which was several feet in length and a few inches wide) at the extreme forward point of the braces intended to hold the forward wheel of the land structure. With this last hydroplane Curtiss succeeded in stopping the tendency of the machine to nose over, and developed hydroplaning qualities sufficient to make him feel satisfied that he could get the machine off the water.

For at least a day, and probably two days, he experimented with the arrangement and strengthening of the parts of the machine as last described, making what he calls "skips" or short flights from the water, not of sufficient height or duration to demonstrate to observers what he could do, but proving to his own satisfaction that a flight could be accomplished. On January 26, 1911, he did attempt a flight, and succeeded in leaving the water for such distance and at such a height that he was able to proceed over the waters of the bay at San Diego and to return to his starting point, thus proving to the satisfaction of those present that sustained flight had been accomplished with this machine.

It is evident from the testimony in this case that on January 26, 1911, and for one or two days prior thereto, Curtiss had a conception, with sufficient reduction to practice to furnish a basis for a claim of invention by him of the particular means of accomplishing the feat of flying from the water with an aeroplane, which was publicly disclosed by the San Diego experiments on January 26, 1911, and published to the world on the following morning in the newspapers.

In this machine Curtiss again used the idea of supporting pontoons as paddles or outriggers to maintain and create lateral balance as in his previous experiments on Lake Keuka. But Curtiss had already observed sufficient in connection with the hydroplaning idea to cause him to attempt to build one hydroplaning pontoon long enough to support the forward thrust when the engine was started, instead of the

two or three small devices which he was then using to accomplish that result. He had such a pontoon built, and evidently having in mind the amount of buoyancy needed and the unnecessary lateral stability and friction caused by the width of his original pontoon, he narrowed his hydroplane surface to the point where he would have sufficient support with the least width in comparison with the length which he felt necessary. This structure was completed somewhere around the 1st of February, 1911, and resulted in successful flight. He sold two of these machines later in the year to the United States government for practical use.

The feature that must be remembered in connection with this main pontoon and with the lateral balancing pontoons is that they were all hydroplaning surfaces, and the large pontoon had at the rear end a sharp departure, in a straight line across its width. But even by this the lesson was not completely learned. Subsequent experiments were made with a buoyant tail or after part attached to the hydroplaning surface of the forward part of the boat, and Curtiss himself, long after, undertook to build a large hydroplane for the carrying of passengers and cargo, known as the America, for a flight across the Atlantic, which had a long sloping tail. The America, however, would not rise with the load intended for her until a step or break (the sharp departure previously referred to) was constructed on the underside of the body.

After the experiments at San Diego, Curtiss came East, further experiments were had with a single main pontoon on Lake Keuka, and on August 22d of that year his application was filed, which has been brought into interference with the Janin application then on file. Subsequently, as has been stated, Janin filed a divisional application for the direct purpose of conducting the interference, and in his divisional application Janin omitted entirely his automobile or land structure and the mechanism to fold the wings in order that the machine could be used as a land structure. Necessarily, in doing away with the wheels, he omitted any reference to the paddle wheel blades which he had previously described as attached to the spokes of his land structure, and which were designed to speed up operation on the water, to reach an effective speed for lifting the device from the water and supporting it by the aeroplane wings.

By this divisional application Janin relinquished, so far as this case is concerned, any attempt to retain the automobile or land-operating features of his machine. It could not even start from the land, but, as was suggested by the issue in the interference proceeding, involved only the idea of an aeroplane that could be started from and which could alight upon water.

No legal objection appears which would prevent such division, and there is nothing improper in law or in morals in the claim by Janin that the parts described in his divisional application were all fully disclosed in his original application, and that he is entitled to the benefit of that disclosure. He has altered neither the drawings nor the language. The plaintiff, however, objects to the result on various grounds. He contends, and the evidence seems to show, that such great resistance

would be caused by the wheels, springs, and other parts of the land apparatus that the original Janin application would never attain speed sufficient to allow it to leave the water so long as these were all attached.

The plaintiff claims, and seems to show, that the paddle wheel blades would not by rotation of the automobile wheels effectively increase the speed of the machine. The plaintiff shows, and has proven, that a long fish-shaped body cannot be driven at sufficient speed upon the surface of the water to cause it to hydroplane, in the absence of hydroplaning surfaces on the underside of the body.

The plaintiff has shown and proven that a long fish-shaped body cannot be tilted in the water without thereby causing additional sucking down of the tail and dragging of the underbody, thus retarding hydroplaning and such increase of speed as would be required to bring the boat to a position where the aeroplane can take it into the air, so long as the aeroplanes and the engine are in any sort of proportion to the size of the total structure.

The plaintiff claims and has proven that the defendant did not disclose anywhere in his original application any idea of separating or dividing his claims or device so as to show the thought of a hydroplane apart from the automobile features with aeroplane wings and boat body. But, Janin's original sketches and model were for the wings and boat only, and to that he added the automobile parts and made the changes called for thereby.

The plaintiff contends that to thus physically divide the application into two parts, one of which has the aeroplane wings, the engine, the boat structure, and the balancing pontoons, while the rest of the application has also the wheels and folding mechanism for the wings, is not an allowable division, but is the making of a new application which is junior in date to the application of Curtiss, in which no such modification has been made.

This question was raised in the Patent Office with regard to the shifting of the burden of proof; the question being raised in a different interference between Janin and Curtiss involving a fourth divisional Janin application, having identically the same disclosure as the present Janin divisional application involved in this suit, and a divisional application of Curtiss having identically the disclosure of Curtiss' application involved in this suit. In that interference, Curtiss' application being the first filed, he was made the senior party, and Janin moved to shift the burden of proof to Curtiss, on the ground that Janin had filed an earlier application, namely, his first application of 1911. The examiner of interferences denied the motion to shift the burden of proof, holding that—

"No positive opinion as to the merits thereof [referring to Curtiss' contention of the inoperativeness of Janin's device] will be expressed at this time, inasmuch as it would have to depend, to some extent at least, upon the interpretation of the issue. * * * Inasmuch as it is not conclusively apparent that either application filed by Janin in 1911 constituted constructive reduction to practice of the invention in issue, said applications do not afford an adequate basis for shifting the burden of proof at this stage of the proceedings."

The same proposition is now presented on this trial, in that the plaintiff insists that Janin's divisional application should not be considered as a part of the application filed January 26, 1911, but is in reality a junior application, and that Janin therefore must show with certainty prior date of conception and diligence in reduction to practice by his application, in order to prevail.

The cases of Laas v. Scott (C. C.) 161 Fed. 122, Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657, and General Electric v. Steinberger, supra, outline the proposition that a junior application must do more than sustain, by mere preponderance of proof, the earlier date of conception and diligent reduction to practice. But in the present action testimony was received from both parties, without attempting to hold them down technically as to order of proof. Every particle of proof that either side saw fit to submit was let in the case, if it was competent and material.

The court must find the facts, and the facts alleged must be established by the plaintiff, so as to show that the decision of the Court of Appeals is incorrect. Thus the burden is on the plaintiff Curtiss to overcome the presumption created by that decision. This can be done only by new and highly persuasive evidence clearly establishing the decision to be incorrect. Morgan v. Daniels, supra. Further, if Janin be deemed junior in application, it would be because his first application does not disclose the invention. This question goes to the merits of his case and will be discussed later.

Another question which arose during the course of the proceedings of the above-mentioned Curtiss divisional application, and which was taken to the Court of Appeals for the District of Columbia, had to do with the decision of the Commissioner of Patents that as a res judicata Curtiss was not the prior inventor of the device of certain claims of the original application included in 'a divisional application filed June 12, 1916. The language of these claims describes solely the operations of the device when in contact with the water, and Curtiss therefore argued before the Court of Appeals that that issue was limited to a mere glider, not even necessarily possessing hydroplaning qualities, inasmuch as there was no specification that the structure must get in the air. The Court of Appeals decided (46 App. D. C. 183) that Curtiss in his 1910 experiments with the canoe structure, which he was unable to get off the water, showed no reduction to practice of any idea beyond that of a glider, while the issue in the preceding interference contemplated a device having the capacity of getting into the air. Janin v. Curtiss, 45 App. D. C. 362, rendered June 1, 1916.

Leaving, therefore, the question of seniority of application as a matter which will be disposed of upon the merits by determination as to whether Janin was entitled to a finding of prior conception and reduction to practice, we will pass on to a consideration of these issues, as well as consideration of the issue of operativeness as presented upon the whole case, and to a finding of the necessary facts from which this determination can be made.

The file wrappers put in evidence show that Janin's application was rejected first on the prior art, which showed a machine consisting of a buoyant member or members supplied with aeroplane wings, an engine, and stabilizing or equilibrium producing means. After considerable argument, the application was viewed by the examiner as narrowed in scope to the description of a device of which the buoyant portion consisted of a central main water-borne hydroplane member, with lateral hydroplanes as balancing and equilibrium restoring devices. On this issue Curtiss and Janin were thrown into interference, and the issue of the interference was stated as follows:

"A hydro-aero machine comprising a main aeroplane supporting surface, lateral stabilizing aeroplane surfaces to create a difference of lift, a main water-borne central boat structure adapted to support the entire machine when on the water, and, except for the aeroplane lift, constituting substantially the entire supporting element at all speeds so long as the boat structure is traveling in contact with the water, relatively small horizontal water-balancing floats located below the supporting plane and beyond each side of said boat structure, said floats being located above the level of the boat bottom and provided with surfaces inclined downwardly and rearwardly, adapted to be acted upon by the rush of water when the machine loses its lateral equilibrium, and means for operating the stabilizing surfaces to create a difference of air lift."

The examiner of interferences decided in favor of Curtiss. The examiner held that Janin was entitled to the date of January 26, 1911, as the date of constructive reduction to practice, inasmuch as his application at that date contained a disclosure of the invention in issue, but that Janin was guilty of lack of diligence from the time he stopped work in 1909 until January, 1911; that during this time Curtiss, with the same conception, reduced the idea to practice in May, 1910, by his canoe glider, which failed to rise from the water solely through the lack of engine power; that it was capable of skimming over the water, and was therefore a "reduction to practice of the invention of the issue, even if it did not get up into the air." The examiner said that Curtiss' statement, in the New York World of July 3, 1910, that he (Curtiss) was disappointed in not getting into the air, was no evidence that the test was not satisfactory, inasmuch as after his experiments at San Diego, with an additional front float, he returned to the single float construction of May, 1910. The examiner held that Curtiss had solved the problem of preventing the wings from dropping when running over the water, and of obtaining proper flotation for gaining speed, while Janin had slept on his rights until the achievements of Curtiss had been widely published, and that Janin then did nothing but file a patent application, which he subsequently abandoned.

An appeal to the Board of Examiners in Chief resulted in a reversal of this finding; the board holding that Janin, by producing a model made as early as 1907, with inclined balancing side pontoons and with all the features of the interference issue, antedated Curtiss, and that "on this same date, January 26, 1911, Curtiss flew in San Diego, Cal., with a machine which embodied the subject-matter of the count, with the possible exception that the central boat structure was not a single, but a double, pontoon device arranged tandem. This flight, however, even though it be regarded as constituting a reduction to practice by Curtiss, cannot be accepted as prior to Janin's filing date of the same

day, not only because of the difference in time between Washington and San Diego, but also, assuming that the filing of Janin's application and the flight of Curtiss occurred simultaneously, Janin should prevail because the first to conceive." Curtiss did nothing in the way of successful reduction to practice until after the date of January 26, 1911, beyond obtaining proper flotation and rising from the water's surface with a machine similar or substantially identical with that produced by him in 1910, so that there was no warrant therein for overriding the law as to the sufficiency of an unchallenged constructive reduction to practice by Janin on January 26, 1911, to show the completion of his earlier invention. The board held that Janin did not sleep on his rights, but was as diligent as was possible, and finally did that which was sufficient in the law; that is, to file an application embodying his invention.

On appeal to the Commissioner of Patents it was held that the testimony on Janin's behalf did not establish that the exhibits existed in their present conditions at any date early enough to avail him, and did not establish with reasonable certainty that he had in mind at any time prior to the filing of the application of January 26, 1911, the necessary elements of a hydro-aeroplane which could rise from the water. By this date the Commissioner held that Curtiss' efforts had been widely heralded and might easily have affected Janin's statements as to what he sought to attain. If, on the other hand, rising from the water was not deemed essential, the Commissioner considered that the examiner of interferences had properly disposed of the controversy.

On this finding it was necessary for the Commissioner to decide whether Curtiss' work with the canoe amounted only to conception, or whether it constituted reduction to practice. The Commissioner based his finding upon a conclusion that the issue in interference depended upon a machine capable of rising in flight from the water.

Examination of the Janin application of July 31, 1913, and of the Curtiss application of August 22, 1911, shows plainly that both Janin and Curtiss intended to describe a machine which could operate on the water and in the air and return to either element as the case might be. This finding was also made by the Court of Appeals of the District of Columbia.

In the case at bar that meaning of the issue in interference has been assumed by all parties. The statement in the issue that the machine is an hydro-aeroplane, and that the buoyant member is substantially the entire supporting element at speeds while the structure is traveling "in contact with the water," indicates that it is adapted to travel thereafter; that is, in the air. There can be no question that every one concerned with the invention has contemplated a machine which could get into the air from water and fly therein, and it is futile to quibble over the possible limitation of the words of the issue to the description of a glider or skimmer alone.

On the present trial the situation of the parties in this respect has been somewhat reversed from that of the interference. Janin and his counsel claim that the charge by Curtiss of willful deception by Janin and his solicitor, in concealing the bottom of the boat in the drawings of the divisional application of July 31, 1913, is answered by Janin

267 F.—14

by showing at this time that hydroplane surfaces were well known and therefore to be understood or usable by any one acquainted with the art in building a device after the language of the Janin specification. But they also suggest that the issue in interference presupposes and does not specify description of the parts which cause the boat to plane out of the water, and that therefore the under surface of the buoyant member is of no importance. .

With this the court cannot entirely agree. If the Janin structure was specifically described and limited as of such shape that it could never fly after once in contact with the water, it would be inoperative as a hydro-aeroplane. It could hardly be argued that, if Janin showed an anchor weight suspended from the botton of his craft, in order to hold it upright, his device would be inoperative, and not movable at all. In the same way, if his device shows nothing beyond a skimmer or glider, the Patent Office might decide in his favor as to the claims describing this skimmer, and could decide in Curtiss' favor as to the claims corresponding entirely to the issue in interference, viz. as to a hydro-aeroplane capable of getting into the air, and the latter claims would be those upon which the patent under discussion in this case would be based. But this charge of inoperativeness must be taken up on the merits in connection with the new testimony on this trial and must be considered further.

The Commissioner upon the appeal to him decided that priority of invention should be awarded to Curtiss, holding that the evidence showing the present condition of the exhibits at any date prior to the filing of the original drawings in the Patent Office, viz. to January 26, 1911, was very slight, and was not established as to any machine which could rise from the water. On appeal to the District Court of Appeals this decision was again reversed, the Court of Appeals holding, as has been previously intimated in this opinion, that Janin's proof as dates, both with respect to conception, preparation of drawings, and work upon models, was clearly established, while Curtiss was held not to have succeeded in rising from the water until January 26, 1911, which was the same date as Janin's first application, and that, since Janin was the first to conceive the invention, this date was too late to avail Curtiss.

The Court of Appeals found that the device of the early Curtiss experiments—that is, the canoe machines used on Lake Keuka—were very different from the modern flying boat. In all of these the engine and the operator's seat were also far above the boat in which both the operator's seat and the engine were placed, as shown in modern devices, and required a long base on the water. This was not changed, even in the Curtiss application of August 22, 1911.

Curtiss evidently was attempting to develop a structure which would fly from the water into the air. The Court of Appeals says that his earlier attempts in 1910 with the canoe machine were nothing more than crude experiments with an inoperative device, but with the purpose in his mind of accomplishing the result which he finally obtained by a different machine. It must be remembered in this particular that the Curtiss device of January 26, 1911, did fly from the water, it did have lateral balancing members, and did have structures in a single

line supporting the device when at rest, and until it planed upon the surface at a speed at which the aeroplane wings could be used both for balancing and lifting purposes. But the San Diego device was gradually modified, and the testimony upon the present case has shown clearly the process of development.

As has been stated, Curtiss was working on the line of the balance of a bicycle. He apparently did not conceive, at any time until the San Diego experiments, that the balance fore and aft was a necessary element to be considered as a part of his hydroplaning surface. He intended to take an aeroplane and put under it surfaces which would hydroplane upon the water and which could be maintained in balance, so far as motion from side to side was concerned. In this he departed from the stable balance of Fabre, and pursued some of the ideas shown by Forlanini in the public print. But Forlanini and Fabre both show that the idea of causing an aeroplane to rise from the surface of water by placing under it hydroplanes was old, at the time of Curtiss' reduction to practice on January 26, 1911, and of the Janin application on that day, and Curtiss has substantially no earlier date of successful conception of a complete structure.

If, on the other hand, we leave out other difficulties, and take the Curtiss structure of January 26, 1911, as a mechanical equivalent of a single pontoon with hydroplaning surface, yet if the Janin structure is operative, Janin's conception was much earlier, and his reduction to practice on that day was good, if he had been diligent in following up his conception without abandonment thereof. The record in the case shows plainly that Janin never abandoned his idea. His diligence was remarkable in the face of the difficulties which he encountered, and, as has been found already in this opinion, he shows clearly and satisfactorily that at some date long before the year 1911, he had prepared the large drawings in the form in which they were ultimately in 1910 given to his attorney for filing an application. His original drawings were not filed with the Patent Office until later, but they are in all respects like the drawings embodied by his solicitor in the patent application. His witnesses, while possibly uncertain or mistaken as to some of the erasures or changes in these original drawings, are positive as to the essential portions thereof, in the papers shown them long before the filing of the patent application.

The propeller in evidence, which was in existence long before the date of this application, shows an apparent improvement or change from the steamboat style of propeller indicated by Janin in the original drawings and in his patent application of 1911, as well as in that of 1913, and, if any inference is to be drawn from this, it would indicate merely that his drawings were of an earlier date than the construction of his large model and of these propellers.

Much attempt has been made by the plaintiff to show discrepancy in the testimony of Janin and his witnesses as to the dates of the construction of this model and their viewing of the exhibits; but the witnesses were carefully observed by the court and their testimony led to the inevitable conclusion that they were testifying from things of which they knew, and that the confusion as to dates and substantial details in no way showed deliberate intention to falsify, nor any rea-

son to doubt that the transactions of which they were telling occurred prior to the date when Janin delivered his drawings to his solicitor for preparation of the application, and hence prior to any date at which Curtiss had successfully brought his device to the point of practical demonstration, whether this demonstration be of a device covered by the issue or not.

The plaintiff sought to show that Janin was not the impoverished person whom he described himself to be. But, while Janin might have obtained the money to have paid a filing fee, there is nothing in the evidence which discredits his testimony that his lack of money was the reason why he accomplished no more than he did, and even if his knowledge of contemporary development in such matters may have finally spurred him on to make the application, his previous delay is not equivalent to an abandonment or a failure to use due diligence equivalent thereto. His small wooden model, introduced in evidence on this trial, corresponds exactly to his original small drawings, as to which he ascribes the date of 1899. Both these drawings and the model describe and illustrate solely a flying boat. The automobile features are entirely lacking, and the devices are evidently intended for use only on the water and in the air.

A serious attack has been made upon the genuineness of the model, inasmuch as Janin made an affidavit at the time of filing his application that no model of his structure had been made. But this model was produced, shown to his attorney, and filed in the Patent Office, on the 4th of December, 1913, and its existence in 1907 or 1908 is plainly indicated by the testimony of the lay witnesses. The fact that it has no automobile structure, no collapsible wings, and is but a partial representation of the structure of the patent application, is sufficient explanation as to why Janin did not refer to this in connection with a model of the complete structure.

The plaintiff also attacks this model because it is like the original sketch of 1899, and because neither of these devices show the changes indicated by the erasures upon the original drawings filed in the Patent Office. The pontoons on this original sketch are closer to the boat structure, while those on the model are further out than the ones shown upon the drawings, and the model shows plain signs that these pontoons have been attached to the wings. The drawings also show the placing of these pontoons on the wings and subsequent erasure therefrom, for the obvious reason that, if the wings are folded, the pontoons would be carried therewith, and hence removed from any possible contact with the water. The wings were to be folded for travel upon the land, and the placing of these pontoons upon outrigger braces from the hull would be plainly a mechanical equivalent for fastening them from braces either to the wings alone or to the wings and the hull together. Their original position upon the model of 1907 is sufficient evidence to indicate that Janin contemplated the possibility of attaching the pontoons to the wings when desirable, long before the completion of the original drawings.

When we consider the sketch of 1899, however, more serious doubts immediately arise. The ideas expressed in this sketch, in the model of 1907, and the drawings used in making the application of

1911, when considered with the erasures and changes in those drawings, show an appreciation of many ideas developed in the prior art and in the progress of aeroplane construction, which make it hard to believe that an untrained youth like Janin could have, as early as 1899, conceived the perfect device portrayed in the original sketch. The book from which the paper upon which this sketch was made was obtained is about 100 years old. Janin's testimony as to its whereabouts and his knowledge or rediscovery thereof is more or less indefinite. It is true, as charged by the plaintiff, that if he had sought to subsequently prepare a sketch for which he intended to claim an earlier date, his use of a book published some 90 years before would prevent any possible proof that the paper had not been in existence. But this does not settle the question, and the wonderful perfection of his idea is the strongest argument that the plaintiff can present against it authenticity. As was said by Dr. Zahm, the plaintiff's expert:

"This sketch, as an original conception and invention of a boy of 20, so trained, would be the most phenomenal thing in the history of aeronautics. This sketch shows the crystallized and perfected results of the inventive genius of a large number of the foremost students in aviation, many of whom were highly trained, and devoted years of time to the study of the principles of mechanical flight."

The drawings as well as the model of 1907 show a so-called stick control, providing for simultaneous direction of the ailerons and rudders, which would have been considered wonderful a decade after this sketch was made.

The Wright experiments, culminating in their patent No. 821,393, of May 22, 1906, application filed March 23, 1903, show a similar method of operation, but with certain features lacking in which the Janin method may be superior. The Bleriot patent, No. 1,009,017, of November 14, 1911, application filed January 31, 1908, and the Esnault-Pelterie patent, No. 1,115,795, of November 3, 1914, application filed January 16, 1908, fix the time when the aeronautical world was working upon a somewhat similar solution of these problems, but in a less perfect manner than that disclosed by Janin. In fact, the ailerons themselves, with the vertical and horizontal rudders of the Janin sketch and model, were impossibilities, so far as the teaching of the prior art is concerned, until the date of the Wright patent, which is the pioneer in aeronautic matters. If Janin had the conception in its perfect form at the time of his original sketch, he could have obtained a patent for a successful aeroplane long prior to the experiments of the Wrights at Kittyhawk, N. C., in 1903, when they were perfecting a glider without engine power.

This brings in another question of which the plaintiff makes much. The Janin sketch, as well as his model of 1907, indicate an engine in the hull of the boat, resembling a gas engine of some sort, which would have been possible of description in 1907 or 1908, or about the time when Janin was in communication with Daniels as to the details of the gas engines which Daniels was building, but which was substantially unknown in 1899. In 1899 perhaps naphtha, illuminating gas, or oil engines might have been in Janin's mind; but it is not conceivable that he could have intended to represent a steam engine, although

he now says that that may have been all of which he knew. His uncertainty of recollection and indefiniteness of statement as to just what he intended by this representation of an engine makes it difficult to place credence upon his statement that the sketch of 1899 was made at that time, in its present state of perfection.

But, however this may be, he certainly abandoned all ideas of developing his conception of an aeroplane and slept upon that idea until these ideas had been given to the world by other inventors, and until a patent was granted to the Wrights therefor. The testimony shows that he attended aeronautic contests or exhibitions, including some by Curtiss himself, that he studied publications and literature relating to the development of the aeroplane, and was considered a "nut" in regard to such matters. These must all have had an unconscious effect upon his conclusions and ideas, and it is impossible for him now to go back and specify just what idea he had at any particular moment. His testimony indicates this very fact. It may be that the so-called sketch of 1899 is a later and different sketch from the one shown to Hegelstein, who could not testify at the time of the interference, through some quarantine regulations affecting him at about that period.

But, even so, Janin does not lose more than the right to claim the invention of the aeroplane itself, which he evidently abandoned, if he had the conception. The making of the model in the year 1907, or even in 1908, shows the possession of all the ideas set forth in the sketch, and establishes a date prior to anything done by Curtiss. The existence of this model is established by the date of a letter of recommendation produced by the witness Staats, dated September 2, 1909, and no successful attack has been made upon the accuracy of this date.

It must be held, therefore, that the conclusions of the various authorities in the Patent Office and of the Court of Appeals, that Janin had successfully established conception prior to the date of any operative and practical construction or reduction to practice by Curtiss, was correct. But Janin's employment of these ideas in any model or drawing was secret, except as he may have made useless paper disclosures to single individuals, until the filing of his application in the Patent Office, and we must therefore consider the contention of the plaintiff that mere naked conception, not followed by reduction to practice, can be defeated by open disclosure and reduction to practice at a date intermediate between the two.

The plaintiff cites the case of Laas v. Scott, supra, as authority for the proposition that Curtiss, if we assume his experiments at San Diego to have been reduction to practice, actually anticipated the filing of Janin's application on January 26, 1911, and therefore prior to his constructive reduction to practice at that time. Here the question of diligence comes in. When two applications are filed in the Patent Office, the junior application may prevail over the senior, if earlier conception, followed by diligence in application, be shown. Lack of diligence or abandonment of the idea may be sufficient to defeat proof of earlier conception. General Electric v. Steinberger, supra. But the date of reduction to practice, by model or structure, is not of

itself controlling, when earlier conception and diligence in filing application is present. See General Electric v. Steinberger, supra, and cases there cited.

Inasmuch, therefore, as Curtiss did not by his San Diego experiments get away in the fundamental idea from the prior art, even though he improved upon it and upon the disclosures of Fabre, and inasmuch as Janin has successfully established conception prior to any of Curtiss' dates, which with due diligence he reduced to practice, so as to be entitled to a finding that his conception had not been abandoned, we must again hold that the decision of the Court of Appeals of the District of Columbia was correct in its finding in Janin's favor.

The only remaining question is the allegation of inoperativeness of the Janin structure as a hydro-aeroplane capable of rising into the air. The plaintiff constructed two full-sized models, which were exhibited at Newport News, in which they sought to show that the Janin structure would not fly from the water. The purpose of these experiments was to demonstrate inoperativeness. Many grounds of criticism have been pointed out in the testimony, indicating that the attempt on the part of the plaintiff was not to succeed, but to demonstrate failure through the use of these models.

It is not necessary to go so far as to hold, with the defendant, that the plaintiff's representatives willfully deviated from the Janin disclosure. The object sought explains their attitude and does not prove a deliberate attempt to deceive. But the fact remains that the tremendously topheavy and large structure attached to the Janin boat did not give an accurate test of the Janin disclosure, and this must be viewed from other standpoints. The models constructed for use in the model tank at Washington more nearly exemplified the behavior of the different pontoons or floats of the issue. As might be expected, a float of the Janin contour and type acted like a fish. It moved through the water easily at low speed, and at high speed continued to cleave the water with a largely disproportionate increase of resistance, as distinguished from the hydroplaning qualities of the model of the Curtiss San Diego plane, and of the model type of navy boat designed by Curtiss. Whether or not the observations and photographs of the Janin model are inaccurate, and whether this model would plane at all, is not satisfactorily shown. In fact, it would seem that the Janin model has little or no hydroplaning qualities, whatever might be its adjustment with respect to its water line and the surface of the water.

This same lack of hydroplaning quality is indicated in the original Janin drawings and even in the Janin application of 1913. Janin had made no experiments. He had no practical knowledge of hydroplaning qualities, and at that time he was still working upon his theory of a flying fish, which moves through the water up toward the surface before shooting out into the air. It seems reasonably certain that a flying fish of this sort could not be made to hydroplane, in the true sense of the word, even with a flat under-surface back to the gills. The experiments conducted in the construction of the flying boat America bear out these propositions, and if Janin anchored his operative aeroplane superstructure to an underbody, which would not hydro-

plane, but would continue to cleave the water, or to bury itself with increasing sucking down tendencies, he would never be able to fly, in the sense intended by the structure defined by the issue in interference.

But Janin discloses in his original patent application, and in all of his subsequent specifications, as well as in his drawings, that he intended to provide his device with a hydroplaning surface. These hydroplaning surfaces were known to the prior art and were matters of common knowledge. Complete demonstration and perfection of detail are not necessary, in order to obtain the right to an invention of the idea illustrated, if a mechanic skilled in the art, following the direction of the patent application and drawings, could reduce it to successful practice.

The patents for the Bell telephone, the Morse telegraph, and the Wright aeroplane show that these structures, when the patents were allowed, were not developed to such form as to be commercially successful or workable. Undoubtedly in 1913, when the final divisional application was made by Janin, the state of the art was such that the underbody surface of the boat could have been made by any skilled mechanic in such form as to get the boat off the water. Has Janin the right, therefore, to take advantage of the knowledge which would have been then possessed, or has he the right to assume that as early as January 26, 1911, his disclosure of a fish-shaped body would have taught the use of hydroplaning surfaces on the underside of his boat, separated from the long tail, round or oval in section, of such proportions that it would have dragged down the device, instead of allowing it to have been tilted up so as to hydroplane and get in the air? Janin says in his patent application of January 26, 1911, that his—

"aeroplane structure is provided with a body portion *1* of elongated formation, and which may be produced with convenience from aluminum or other light and strong material in the shape of the hull of a boat, its forward or bow end portion *2* being tapered and rounded to lessen the resistance of the air and water to its passage therethrough, and its rear or stern end portion *3* being also tapered and formed upon such lines as may seem best adapted for facilitating management and the attainment of high speed."

Janin contends that his failure to show a hydroplaning surface in his divisional application of July 31, 1913, is like his omission of an engine or power-furnishing device in his original application, or like the failure of Curtiss, in his application of August 22, 1911, to show more in the way of an engine than the outlines of four cylinders and a shaft. In fact, examination of the Wright patent for the aeroplane itself shows the presence of no engine whatever to drive its propellers, and as a matter of fact the original Wright aeroplane patent does not even show propellers.

Failure to show in an application for patent an operative or successful means of accomplishing the result claimed in the application is sufficient reason for denying the patent, if the invention is directed to such use of the whole as to require operativeness of the parts covered by the claims. If the claims presented describe the entire de-

vice, then operativeness is one of the necessary elements of the disclosure. On the other hand, the claim may simply show means for accomplishing certain parts of an operation. For instance, an application for a power-driven sawmill patent would not require description (either in the specifications or the claims) of a steam engine to drive the belt or shaft. The device would be patentable without describing the source of power, and could have been patented before the invention of the steam engine.

In an aeroplane, invention might be claimed for the wings alone, or for the method of controlling the rudders and ailerons. Take, for example, the Bleriot patent, supra, which does not describe the aeroplane, but assumes that a reference to an aeroplane as a machine of the type then understood and referred to in the patent was sufficient fundamental structure for the application of the claimed invention. It would follow that both Curtiss and Janin were justified, so long as they were filing an application for the use of an engine of any sort known to the world, in leaving to the skilled mechanic, or to the one following the patent, the use of whatever engine he might think most efficient; the only essential being that it be adapted to the purpose.

If an inventor should intend to try out a new kind of steam engine in an aeroplane, and should find that the weight of the engine kept the aeroplane upon the ground, when it had been proved or was known that with a light engine the aeroplane would fly, the patent should not be held inoperative, because it had not described the particular kind of engine which could be used. In the same way, the different parts of a hydro-aeroplane are mechanically interchangeable in so far as they do not affect the functions of the machine covered by the claims of the patent. Neither the Curtiss nor the Janin application would be construed to be limited to the use of a monoplane or biplane, any more than to the use of mahogany as distinguished from black walnut, or some other wood, in making the hull of the boat. But if it is to be a hydro-aeroplane or a hydroplane-aeroplane, in the ordinary sense, it must operate upon the water like a hydroplane, and be able to mount into the air for operation like an aeroplane.

As has been said, Janin made no practical experiments. His knowledge of the art of hydroplaning seemed at the time of trial to have developed no further than a general knowledge that planing surfaces were necessary. He has the present idea that he intended his model to show sufficient planing surface to get on the water. He contends that in 1913 his application presumed such shape for the bottom of the hull as to produce a planing effect. It is evident that this was so at that time, for the reason that he was already in interference with the Curtiss application, which employed simple hydroplaning surfaces as in the construction of its pontoons. The world at that time was well acquainted with the idea of hydroplaning, and with the then obvious proposition that the speed necessary to obtain lift from the airplanes could be reached in any structure having a properly balanced proportion of wings and engine to the size of the boat, by getting the boat up on the surface of the water, where the sucking down would be

decreased, and the speed increased, beyond any conditions possible with a boat driven through the water.

From 1908 on Curtiss had been working to so arrange the proportions of his machine that the hydroplane or hydroplaning surfaces, which he and others knew could be made to skim upon the water, would be sufficient to make possible the starting of his engines, handling of the machine until speed was obtained, the balancing of the machine until in the air, and also the arrangement of his parts so that, upon returning to the water, he could successfully alight thereon at the tremendous speed which he must necessarily have in order to come down to the water without overturning his aeroplane and falling before he struck the water.

Curtiss was seeking to get away from the multiple form of hydroplane, whether arranged like Fabre, with three points of contact, or like Forlanini, with a number of hydroplanes at different depths in the water. Curtiss was also for a time trying to get away from his canoe by the use of hydroplane pontoons. He ultimately came back to the canoe idea, but placed a hydroplaning surface under the canoe. The Curtiss application and the issue in interference describes a canoelike structure as the longitudinal dimension of the hydroplane is considerably greater than its width. But the issue of the interference also fits, and the words of the issue could be made to read upon the original hydroplane structure taken by Curtiss in December, 1910, to San Diego for experiment, in which the width was considerably greater than the length resting upon the water, if an aviator had become expert enough to so handle his craft as to keep it in balance until he left the water. Dr. Zahm has testified that theoretically this could be done, and a man might be able to accomplish it in practice. But the only practical ideas would be those showing a craft which could be operated even in rough weather and by an operator of ordinary skill. Curtiss was therefore not able to reduce his theoretical ideas to practice, and hence to describe a practical construction, until he obtained the canoe-shaped pontoon with a hydroplaning under surface.

The modern modifications of the Curtiss craft show, so far as the under surfaces are concerned, nothing more than modifications of this hydroplaning bottom canoe idea. The so-called break or step has been found necessary in order to give the advantage of the long rearwardly extending portion of the canoe for the preservation of longitudinal balance, while obtaining the hydroplaning qualities of the bottom, which, when the machine was in ordinary balance, would be in contact with the surface of the water as displaced by the weight of the machine. In other words, Curtiss and other manufacturers of hydro-aeroplanes have added the tail, but at a different level to the original hydroplaning pontoon of the Curtiss application in interference.

This is not a necessary element of the claims in interference. Ability to rise out of the water, either by planing up on the water in order to get up speed, or by acquiring such speed upon the surface as to gain the benefit of the air lift of the wings, was assumed by Janin in all of his structures. His concept presupposes a structure in which such

speed could be obtained. The Patent Office rejected both his application and Curtiss' application, in so far as they attempted to claim a form of device aimed only at reaching this speed. The original English publication of Froude and the Forlanini publications, as well as the many hydroplane patents of the prior art, were sufficient citations upon which to reject any claim of basic invention or discovery by either Curtiss or Janin of a surface available only for speeding and hydroplaning.

The invention consisted in so arranging the other parts of the machine, including the lateral pontoons and the single boat structure, as to make a practical hydro-aeroplane the basis of the issue in interference. Janin stubbornly insists to the present day that his fish-shaped device possesses planing qualities; but any skilled mechanic, with knowledge of the prior art, would, after the year 1908, have so constructed the under surface as to make the boat plane, if he found that the form of bottom which he was using sucked into the water. Janin would have the right at any time to substitute a planing surface under his fish body if he found this desirable, and his structure, in so far as the elements of the issue in dispute were concerned, was operative, unless he refused to use the devices taught by the prior art and anchored his machine, as has been previously stated, just as much as if he had suspended weights therefrom.

The very fact that by a division of his application Curtiss has sought to obtain a patent for the construction of a mere glider shows that the issue in interference was not dependent upon the presence of the precise form of hydroplaning surface which he used in his device described in his application of August 22, 1911, or in his device used at San Diego on January 26, 1911. It must be held, therefore, that the possible and probable failure of the original form of boat bottom described by Janin does not render inoperative the structure of a hydro-aeroplane involving only the elements of the interference issue. His pontoons had planing surfaces located where they would help get the boat on the water.

Given a boat bottom which would hydroplane, the Janin structure was certainly operative as a hydro-aeroplane. Such surfaces were shown by the prior art at all times after Janin had his concept clearly formulated; that is, from 1907 or 1908 on, provided he did not attempt the additional feature of a machine to run on the land. This latter device was clearly separable from his structure for getting into the air from water, flying in the air, and returning to the water, and it must be held, therefore, that Janin had a complete concept and disclosed the elements of the issue in interference, even though he surrounded these with devices which were not practical, and which later had to be discarded.

The decision of the Court of Appeals of the District of Columbia was therefore correct in awarding the right to the invention of the issue in interference to Janin, and upon the present case the defendant should have a decree.